**Albert Richard ROY, Jr., Appellant,**

v.

**UNITED STATES of America,**
Appellee.

No. 23229.

United States Court of Appeals
Ninth Circuit.

Aug. 22, 1969.

William N. Fielden (argued), La Jolla, Cal., for appellant.

Shelby R. Gott (argued), Asst. U. S. Atty., Edwin L. Miller, Jr., U. S. Atty., San Diego, Cal., for appellee.

Before BARNES and DUNIWAY, Circuit Judges, and PREGERSON, District Judge *.

PREGERSON, District Judge.

Albert Richard Roy, Jr., was found guilty in a non-jury trial of violating 18 U.S.C. § 871 for threatening the life of the President of the United States.[1] He appeals from the judgment.

## STATEMENT OF FACTS

On November 9, 1967 Roy was a private first class in the United States Marine Corps, stationed at Camp Pendleton. He was waiting to be `flown to Viet Nam. At the last minute, against his wishes, he was re-assigned to school in the United States.

That evening Roy visited a friend in another barracks on the base. Other Marines were in the barracks, and Roy stated that they were "joking around about the President coming and how they were going to `get him with cannons and how everybody was going to shoot them off."[2] The President of the United States was scheduled to arrive at Camp Pendleton the following day.

Roy went outside the barracks to a pay telephone. He picked up the receiver and stated to the operator the words for which he was convicted. The telephone operator testified that Roy said, "[T]ell the President that he should not come aboard the base or he would be killed."[3] Roy testified that he said, "Hello, baby. I hear the President is coming to the base. I am going to get him."[4] Roy then hung up the receiver.

The telephone operator became frightened. She held the line in order to receive any other calls from that telephone and immediately notified her supervisor. Within a minute, or thereabout, Roy picked up the telephone again. The operator recognized his voice as the voice that had made the threat. She asked him if he knew the name of the person who had just left the telephone booth.

---

* Honorable Harry Pregerson, District Judge, Central District of California, sitting by designation.

1. The statute reads as follows:

   "(a) Whoever knowingly and willfully deposits for conveyance in the mail or for a delivery from any post office or by any letter carrier any letter, paper, writing, print, missive, or document containing any threat to take the life of or to inflict bodily harm upon the President of the United States, the President-elect, the Vice President or other officer next in the order of succession to the office of President of the United States, or the Vice President-elect, or knowingly and willfully otherwise makes any such threat against the President, President-elect, Vice President or other officer next in the order of succession to the office of President, or Vice President-elect, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

2. R.T. 57.

3. R.T. 31.

4. R.T. 58.

Roy gave her a fictitious name. He testified that he also told her at that time that the statement about the President was a joke and that she should forget about it. The operator testified that she did not hear him say it was a joke.

Roy completed a call and then asked to place a collect call. The operator asked Roy for his own name so that the receiving party could determine whether to accept the collect call. Roy then gave the operator his true name.

Later that evening, in the early hours of November 10, 1967, Roy was awakened and taken into custody. The President of the United States arrived at the base later that day.

Roy appeals on three grounds: (1) lack of a threat within the statute, (2) lack of requisite willfulness, and (3) insufficient evidence. All three grounds essentially raise the question of whether there is sufficient evidence to show that Roy's conduct came within the proscription of the statute.

## THE WORDS USED CONSTITUTED A THREAT

In the context in which it was used, the word *president* was reasonably interpreted to mean the President of the United States. The expected arrival of the President of the United States was a matter of common knowledge at Camp Pendleton, as evidenced by the alleged discussion among the men in the barracks. Assuming Roy's version of the statement made to the telephone operator to be correct,[5] the trial court was reasonable in considering the statement "I hear the President is coming to the base" to refer to the President of the United States.

The trial court was also reasonable in interpreting the statement "I am going to get him" to indicate a threat to take the life of or to inflict bodily harm upon the President.[6] We must therefore reject Roy's argument that the words used did not constitute a threat within the language of the statute.

## THE THREAT WAS KNOWINGLY AND WILLFULLY MADE

The statute requires that the threat be made knowingly and willfully.[7] In the recent case of Watts v. United States, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969), the Supreme Court raised some question over the proper construction to be given the word *willfully*.[8] To construe the meaning of the word *willfully* it is useful first to determine

5. The usual rule on appeal is to view the evidence in the light most favorable to the appellee (the Government). Noto v. United States, 367 U.S. 290, 296–297, 81 S.Ct. 1517, 6 L.Ed.2d 836 (1961). The court below stated, however, "[I]f you take [Roy's] version of it, I think there is—I can't see anything but guilt." R.T. 81. This statement was made during a discussion with the attorneys in chambers. Its significance is unclear; it could mean that the court below accepted Roy's version of the telephone conversation.

6. Roy's attorney argues that the word "get" could mean "to become even with" or "gain an advantage over." We do not agree. If Roy's words were stated in a political or athletic context, for example, they might reasonably be interpreted to mean "become even with" or "prevail over." But when stated in the context of an anonymous telephone call from a Marine base, the words "to get the President" would seem to mean "to take the life of or to inflict bodily harm upon the President."

7. *Supra* note 1.

8. The Supreme Court stated in a per curiam opinion: "Some early cases found the 'willfullness' requirement met if the speaker voluntarily uttered the charged words with 'an *apparent* determination to carry them into execution.' (citations omitted). The majority below seemed to agree. Perhaps this interpretation is correct, although we have grave doubts about it." 394 U.S. at 707–708, 89 S. Ct. at 1401. A more complete discussion of the willfulness requirement is found in the majority and dissenting opinions of the Court of Appeals in Watts v. United States, 131 U.S.App. D.C. 125, 402 F.2d 676 (1968).

the legislative purpose in enacting the statute.[9]

One purpose of the statute may have been to prevent assaults upon the President.[10] Another purpose may have been to prevent statements that would have the effect of inciting others to assault the President.[11]

The statute seems to be designed to prevent a further mischief or evil, for if Congress desired to prevent an actual assault upon the President, then it could have drafted the statute to make it a crime to assault, attempt to assault, or conspire to assault the President. There would have been no need to direct the statute to threats. Similarly, if Congress desired to prevent incitement of others to assault the President, then it could have limited the statute to make it a crime to incite or induce others to assault or attempt to assault the President.

█ Thus, it appears that the statute was designed in part to prevent an evil other than assaults upon the President or incitement to assault the President. It is our view that the other evil is the detrimental effect upon Presidential activity and movement that may result simply from a threat upon the President's life.[12]

A threat against the President may cause substantial harm and is qualitatively different from a threat against a private citizen or other public official. A President not only has a personal interest in his own security, as does everyone, he also has a public duty not to allow himself to be unnecessarily exposed to danger. A President's death in office has worldwide repercussions and affects the security and future of the entire nation.[13] The President and his advisors would therefore be irresponsible if they ignored apparently serious threats against the President's life.

If a threat is made in a context or under such circumstances wherein it appears that it is a serious threat, and the President or his advisors are made aware of the existence of the threat, then the threat would tend to have a restrictive effect upon the free exercise of Presidential responsibilities, regardless of whether the person making the threat actually intends to assault the President and regardless of whether there is any actual danger to the President. Thus, even though the maker of the threat does not have an actual intention to assault the President, an apparently serious threat may cause the mischief or evil toward which the statute was in part directed.

█ This Court therefore construes the willfulness requirement of the statute to require only that the defendant intentionally make a statement, written or oral, in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm upon or to take the life of the President, and that the statement not be the result of mistake,

---

9. *See, e. g.,* United States v. American Trucking Ass'ns, Inc., 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940).

Examining the language of the statute may be more fruitful here than looking to the legislative history. The majority and dissenting opinions in Watts v. United States, 131 U.S.App.D.C. 125, 402 F.2d 676, 686 (1968), took widely divergent views over the legislative history.

10. *See* Watts v. United States, *supra* note 9, at 678–679 and 689.

11. *Id.*

12. "This bill is designed to restrain and punish those who would threaten to take the life of, or inflict bodily harm upon, the President of this Republic. It is the first duty of a Government to protect its governmental agencies, in the performance of their public services, from threats of violence which would tend to restrain them in the performance of their duties."

H.R.Rep.No.652, 64th Cong., 1st Sess. (1916).

13. *See,* Watts v. United States, *supra* note 9, at 683.

878

duress, or coercion.[14] The statute does not require that the defendant actually intend to carry out the threat.[15]

In this case, Roy made an anonymous telephone call threatening the life of the President. The telephone operator knew that the telephone call came from Camp Pendleton, where Marines were stationed with access to weapons and ammunition. The President was due to arrive in a few hours and might review or address the troops as Commander-in-Chief of the armed forces. The operator had an immediate duty to inform the authorities in order that the danger might be averted.

Whether Roy acted from an intention to assault the President or from youthful mischief, he necessarily set in motion emergency security measures that might have impeded the President's activities and movement and which certainly resulted in additional investigatory and precautionary activities. This was the kind of mischief which the statute was designed in part to prevent.

Roy contends that the willfulness requirement of the statute was not satisfied, because he later told the telephone operator that the threat was a joke. The Government argues that the claim that the threat was made as a joke is not a defense within the statute and cites Pierce v. United States, 365 F.2d 292 (10th Cir. 1966), and Ragansky v. United States, 253 F. 643 (7th Cir. 1918).

■ To say that it is no defense to claim that the threat was made as a joke is an overstatement. If a threat were made in a context of levity, so that a reasonable person would interpret the words used to be mere hyperbole or jest, not intended to express a true intention to inflict bodily harm upon the President, then the words would not constitute a threat within the scope of the statute. In this context it would be apparent to a reasonable person that the individual uttering the words was not making a serious threat.

■ The allegation that the threat was made as a joke is therefore relevant to the issue of whether a threat was knowingly and willfully made, and it is to be considered by the trier of fact in light of all the circumstances. Here there was a conflict in the testimony as to whether Roy later told the telephone operator that the threat was a joke. But even if we assume for the purpose of argument that Roy later told the operator that the threat was a joke,[16] one could not reasonably expect that this would eradicate the apprehension created by the first call. The telephone operator was not acquainted with the anonymous caller and she was not talking to him fact to face; she had no reliable way to determine whether the anonymous caller was joking. The later statement that the threat was a joke would therefore not necessarily eliminate the mischief created. Under these circumstances, regardless of whether Roy later stated that the threat was a joke, it appears that the court below was not in error in finding that Roy knowingly and willfully threatened the life of the President.

---

14. *Accord*, Michaud v. United States, 350 F.2d 131 (10th Cir. 1965); Ragansky v. United States, 253 F. 643 (7th Cir. 1918).

15. Judge Wright seemed to take the view that the statute requires a showing of specific intent to carry out the threat. Watts v. United States, *supra* note 9, at 686 (dissenting opinion). He noted that only when the maker of the threat has a subjective intention of carrying it out is there an actual danger to the President, and if the statute is limited to those individuals who constitute an actual danger, this would be sufficient to protect Presidential mobility. *Id.* at 689 n. 7.

Judge Wright's view would seem to eviscerate the statute of its intended effect. In many cases, only after extensive investigation can the identity of the person who made the threat be ascertained and his intentions determined. Meanwhile, the threat may have reasonably caused sufficient apprehension to curtail Presidential movement and activities.

16. See, *supra* note 5.

## SUFFICIENCY OF THE EVIDENCE

Having reviewed the entire record on appeal and having considered the arguments of counsel, it appears that even if we accept Roy's version of the statement made to the telephone operator and accept Roy's allegation that he later told the telephone operator that the threat was a joke, the evidence was sufficient to support a finding of guilt under the statute.[17]

The judgment is affirmed.

---

17. Roy does not contend on appeal that the conviction infringes on his First Amendment rights. Unlike the situation in Watts v. United States, *supra* note 8, there does not appear to be a free speech issue in this case.