**UNITED STATES of America,**
**Appellee,**

v.

**Ronald Douglas PATILLO, Appellant.**

**No. 13948.**

United States Court of Appeals,
Fourth Circuit.

Feb. 16, 1971.

Haynsworth, Chief Judge, dissented and filed opinion in which Winter, Circuit Judge, concurred.

Albert V. Bryan, Circuit Judge, dissented for reasons expressed in his dissent to panel opinion.

Victor J. Ashe, Norfolk, Va. (Court-appointed) [S. W. Tucker, Seymour Dubow, and Hill, Tucker & Marsh, Richmond, Va., on brief], for appellant.

Roger T. Williams, Asst. U. S. Atty. (Brian P. Gettings, U. S. Atty., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and SOBELOFF, BOREMAN, BRYAN, WINTER, CRAVEN and BUTZNER, Circuit Judges sitting en banc, on resubmission.

CRAVEN, Circuit Judge:

This is a reconsideration en banc of a panel decision reported under the same name, 431 F.2d 293. We granted the government's petition for rehearing and adopted its suggestion for reconsideration en banc because of our concern for the safety of the President and for his protection from disruptive threats of violence to his person. We considered further oral argument unnecessary, but granted permission to the parties to file supplemental briefs. Neither Patillo nor the United States has elected to supplement the excellent briefs furnished originally to the panel, and the government advised the Clerk that it would rely upon the arguments furnished in its original brief and in its petition for rehearing.

It is urged upon us in the petition that the Supreme Court's "grave doubts", Watts v. United States, 394 U. S. 705, 708, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969), as to the *Ragansky* test of intention [Ragansky v. United States, 253 F. 643 (7th Cir. 1918)] must now have been disspelled by two recent decisions from the Second and Ninth Circuits.

In Roy v. United States, 416 F.2d 874 (9th Cir. 1969), the defendant communicated anonymously to a telephone operator that the President might be assassinated if he made an intended visit to Camp Pendleton. As might have been reasonably expected, the telephone operator became frightened, notified her telephone supervisor, who apparently notified those charged with the protection of the President. Although the opinion does not delineate the extent of any disruption that may have resulted, we think it may be judicially noticed that any reported threat on the President's life is bound to be harmful.

> A threat against the President may cause substantial harm and is qualitatively different from a threat against a private citizen or other public official. A President not only has a personal interest in his own security, as does everyone, he also has a public duty not to allow himself to be unnecessarily exposed to danger. A President's death in office has worldwide repercussions and affects the security and future of the entire nation. The President and his advisors would therefore be irresponsible if they ignored apparently serious threats against the President's life.
>
> If a threat is made in a context or under such circumstances wherein it appears that it is a serious threat, *and the President or his advisors are made aware of the existence of the threat,* then the threat would tend to have a restrictive effect upon the free exercise of Presidential responsibilities, regardless of whether the person making the threat actually intends to assault the President and regardless of whether there is any actual danger to the President. Thus, even though the maker of the threat does not have an actual intention to assault the President, an apparently serious threat may cause the mischief or evil toward which the statute was in part directed. (Emphasis added.)

*Id.* at 877.

It was in this context that the Ninth Circuit opinion contained the statement: "The statute does not require that the defendant actually intend to carry out the threat." *Id.* at 878.

Our panel decision in this case is not to the contrary.

> This case does not involve the communication, or attempted communication, by a defendant of his threat to the President. Accordingly, we do not here consider what intent requirement may be effective to accomplish an insulation of the President from threats of violence to his person and also be in accordance with the wording of Section 871(a). We hold that where, as in Patillo's case, a true threat against the person of the President is uttered without communication to the President intended, the threat can form a basis for conviction under the terms of Section 871(a) only if made with a present intention to do injury to the President.

United States v. Patillo, 431 F.2d 293.

United States v. Compton, 428 F.2d 18 (2d Cir. 1970), is factually similar to *Roy, supra.* Compton telephoned the New York Police Department emergency number and advised that he intended to assassinate the President with a .38 automatic Smith and Weston service revolver. As might have been expected, the threat was not ignored. Officers were sent to apprehend the caller, and he was taken into custody. It was in this context that the Second Circuit held "that it was not necessary to establish an intention to carry out the threat."

 We agree with both circuits that the statute was designed to prevent a secondary evil other than actual assaults upon the President or incitement to assault the President, and that it is a legitimate area of congressional concern to prevent and make criminal disruption of presidential activity and movement that may result simply from publication of an apparent threat upon the President's life. When a threat is published with an intent to disrupt presidential ac-

tivity, we think there is sufficient mens rea under the secondary sanction of the statute.

But for the reasons stated in the majority opinion of the panel, 431 F.2d 293, we reject the *Raginsky* test of intention. We think that an essential element of guilt is a present intention either to injure the President, or incite others to injure him, or to restrict his movements, and that the trier of fact may find the latter intention from the nature of the publication of the threat, *i. e.*, whether the person making the threat might reasonably anticipate that it would be transmitted to law enforcement officers and others charged with the security of the President. Much of what we say here is dicta justified, we think, by apparent misunderstanding of our prior panel decision. For Patillo was not prosecuted on a theory of intention to disrupt presidential activity and the nature of publication of his threat would scarcely support it.

As to Patillo's case which is quite different from Roy's and Compton's, we adhere to the panel decision, 431 F.2d 293, adding to it only that the trier of fact may, of course, consider all relevant facts concerning the background of the defendant, his motives, the manner in which the threat was made, and the reaction of those who heard the threat and thus have an opportunity to form an opinion about the speaker's present intention to injure the President of the United States.

HAYNSWORTH, Chief Judge (dissenting):

I would affirm the conviction.

I think we have succeeded only in getting ourselves amidst a tempest of semantics, and that substantively the test applied by the District Court was the one the majority prescribes. I could accept substantially all that the majority says, if its conclusion were only for affirmance.

Of course the apparent intention test was misapplied when it was held to include statements made in jest and the obvious hyperbole. Subsequent correction of earlier misapplications of the test, however, ought not to require reversal of a conviction obtained when the proper test was correctly applied.

We deal here with a true threat, as the majority readily concedes. There is nothing in the relation between the two guards, or in any of the surrounding circumstances, in the words that were spoken, or in the manner in which they were spoken containing the slightest suggestion of a jest. For all that appears, the words were spoken in deadly seriousness.

If the author of such a threat is to be halted on the basis of a commission of an offense prior to the time of an actual attempt to execute the threat, when the gun barrel is aimed at the President and the finger is on the trigger, his intention at the time the threat is made must be judged on the basis of the words, themselves, in the context in which they are spoken or written. It is simply an objective standard for measuring the defendant's intention. It is, in short, what the majority says should be done in the ultimate paragraph of the supplementary opinion.

That is to me, however, the "apparent intention" test. The trier-of-fact looks at the words, the context in which they were spoken, including the reaction of the listeners, to determine the apparent intention of the speaker at the time of the true threat.

What the majority would have the District Court do on a retrial has already been done. The words were not considered by the District Court in isolation, but in their full context; and it has been determined that, in that light, the words were a manifestation of a present intention to kill the President. The trial judge's use of the word "apparent" in referring to the defendant's intention appears to me to have meant no more than that his intention was being appraised by objective criteria, which, indeed were the only criteria available.

 

To the extent, therefore, that the majority substantively embraces the apparent intention test, as I understand it, I agree, though I disagree with their verbal rejection of it and the reversal of this conviction which meets the substantive standards they prescribe.

Nor can I agree that the majority has adequately distinguished Roy v. United States, 9 Cir., 416 F.2d 874, and United States v. Compton, 2 Cir., 428 F.2d 18. The majority says that because the threat in *Roy* was made to a telephone operator and the threat in *Compton* to a New York City policeman, the defendants could reasonably anticipate their communication to the White House with resultant disruption of presidential activity. The defendant here, however, made his threat to a shipyard security guard who promptly reported it to his superior who relayed it to the Secret Service, the agency immediately charged with the protection of the President; and subsequent investigation was conducted by the Secret Service. We are not told whether President Nixon actually heard of the threats, but the Secret Service did. That is all that appears in *Roy* and more than appears in *Compton*. Moreover, one who did communicate such a threat to a shipyard security guard,* as the defendant did, should anticipate its communication to the Secret Service as reasonably as one who communicates it to a city policeman, and probably much more so than one who communicates it to a telephone operator having no training or duties in security matters.

For such reasons, I respectfully dissent.

WINTER, Circuit Judge, authorizes me to state that he concurs in the views I have expressed.

---

* The two were only casually acquainted. There was nothing in their relationship to lead the defendant to believe the other would respect the communications as confidential.

ALBERT V. BRYAN, Circuit Judge (dissenting):

For the reasons I expressed in my dissent to the panel opinion in this case, 431 F.2d 293 (August 20, 1970), I would affirm the judgment of the District Court.