**UNITED STATES of America,[1]**
**Plaintiff-Appellee,**

v.

**Eugene M. HART, Defendant-Appellant.**
**No. 71–1682.**

United States Court of Appeals,
Tenth Circuit.
April 7, 1972.

W. Allen Spurgeon, Asst. U. S. Atty., Denver, Colo. (James L. Treece, U. S. Atty., and Gordon L. Allott, Jr., First Asst. U. S. Atty., Denver, Colo., on the brief), for plaintiff-appellee.

Albert B. Dawkins, Denver, Colo., for defendant-appellant.

Before HILL, BARRETT and DOYLE, Circuit Judges.

BARRETT, Circuit Judge.

Eugene M. Hart was convicted of willfully and knowingly making threats to take the life of, and to inflict bodily harm upon, the President of the United States in violation of 18 U.S.C. § 871.

On March 24, 1970 Hart telephoned the F.B.I. office in Denver, Colorado, and said he was Charles Hart. He reported that his brother was en route to Washington, D. C. to kill the President. Hart also called Paul Rundle, Special Agent in Charge, Secret Service, Denver, Colorado, and gave him the same information. He stated that Hart could be found at the Brown Palace Hotel or at the U.S.O. in Denver.

Gerald W. O'Rourke, Special Agent, Secret Service, went to the Brown Palace with another agent. He found Hart in the lobby and gave him his Miranda warnings. Hart said he was going to Washington, D. C. to assassinate President Nixon. He stated "I am going to kill the President." He planned to get a gun from a friend in California. Hart was taken to the Secret Service office.

Hart was arrested by Rundle for threatening the life of the President. Hart was informed again of his Miranda rights and he was then questioned by Rundle in the presence of O'Rourke after stating that he would discuss the matter. Hart volunteered, in detail, his plan to kill the President. He intended to fly to Washington, D. C. on an airline pass and then join a Congressional tour of the White House. During the tour he would stay in the back of the group until it was near a certain curtain in the basement. He would then hide himself in that vicinity of the White House. He related where security officers were stationed. When the President came down a stairway to work the following morning Hart would shoot and kill him from his "hiding" place. Rundle testified that Hart's description of the positions of security stations in the White House and use of the stairway by the President were accurate. Hart said he wanted to kill the President because his request to be stationed at Fitzsimmons Army General Hospital had been rejected by President Nixon. Hart said

he would obtain a gun from friends in California.

On March 27, 1970 a hearing was held. Hart was represented by counsel. He was ordered to the Medical Center for Federal Prisoners in Springfield, Missouri for examination. He was indicted on June 5, 1970. A competency hearing was held on July 17, 1970. The Court found Hart unable to stand trial and he was returned to Springfield. On August 20, 1970 Hart filed a Motion for Judicial Determination and on September 9, 1970 he moved for a speedy trial or dismissal of the charges. On January 29, 1971 new counsel was appointed to represent Hart. At a hearing on June 30, 1971 three psychiatrists testified that Hart was then competent to stand trial. The trial began the same day.

Hart contends that: (1) he was prejudiced by interruption of his legal counsel; (2) there was insufficient evidence to show that he was sane at the time of the commission of the alleged offense; (3) the evidence was insufficient to establish willfulness; and (4) the trial court erred in refusing Instructions 1 through 6 tendered by him.

Hart contends that he could not adequately prepare for trial because of interrupted legal counsel; that he was denied adequate discovery and pre-trial preparation; and that he was not arraigned. He was arrested on March 24, 1970 and Robert Bugdanowitz was appointed his counsel. A hearing was held on March 27, 1970 following which Hart was ordered to the Medical Center for Federal Prisoners in Springfield, Missouri, for examination. In August of 1970 he filed a Motion for Judicial Determination and in September of 1970 he filed a motion for speedy trial or dismissal. He was returned to Denver on December 18, 1970. Mr. Mancini was appointed his counsel on January 29, 1971. Hart alleges that he was without counsel between March 24, 1970 and January 29, 1971 and that, as a result, he could not adequately prepare for trial and file motions.

Although there is no evidence in the record to indicate whether Hart was formally arraigned, the general rule is that arraignment under Rule 10 is not necessary when the defendant knows what he is accused of and is able to adequately defend himself. Garland v. State of Washington, 232 U.S. 642, 34 S.Ct. 456, 58 L.Ed. 772 (1914); Merritt v. Hunter, 170 F.2d 739 (10th Cir. 1948). The record reflects that Hart was well appraised of the charges against him and that he was fully prepared for trial. There was no denial of due process. Hart has not demonstrated any prejudice due to the absence of counsel for a period of about ten months.

Hart alleges that the Government failed to meet its burden of proof of his sanity beyond a reasonable doubt at the time of the commission of the alleged offense and that the trial court should have granted his motion for acquittal at the close of the Government's case-in-chief. He points to his history of mental illness, his psychiatrist's testimony that he was insane at the time of the commission of the alleged offense and the trial court's recommendation that he be given psychiatric treatment, all in support of his contention of insanity as a matter of law.

The Government fulfilled its burden of proof that Hart was sane. The issue was then one of fact to be resolved by the jury. The Government's psychiatrist and two lay witnesses testified that Hart was sane at the time of the commission of the alleged offense. This constitutes substantial evidence. Hart's psychiatrist testified that Hart was insane. A third psychiatrist's testimony was discredited. There was conflicting evidence. The dispute of fact was resolved by the jury against Hart on his claim of insanity and its finding will not be disturbed on appeal. Wion v. United States, 325 F.2d 420 (10th Cir. 1963), cert. denied 377 U.S.

946, 84 S.Ct. 1354, 12 L.Ed.2d 309 (1964).

■ Hart contends that the "willfulness" requirement of 18 U.S.C. § 871 was not established by the prosecution because it was not proven that he intended to carry out the threat. The "willfulness" requirement of 18 U.S.C. § 871 has had a nebulous interpretive history. This court in Michaud v. United States, 350 F.2d 131 (10th Cir. 1965), Pierce v. United States, 365 F.2d 292 (10th Cir. 1966), and Rothering v. United States, 384 F.2d 385 (10th Cir. 1967), followed the interpretation laid down in Ragansky v. United States, 253 F. 643 (7th Cir. 1918) which held that a threat is willfully made if the maker voluntarily utters the threatening words as a "declaration of an apparent determination to carry them into execution."

In *Ragansky* the language "I can make bombs and I will make bombs and blow up the President," although jokingly made, was held to be willful. The Court held that language used as a joke is no defense. In *Michaud* we reversed because the trial court erroneously instructed the jury that it must find beyond a reasonable doubt that the maker of the threats intended to carry them out himself. In *Pierce,* we held that remarks made jokingly by one cellmate to another that he would kill the President at the first opportunity was not a defense. The Court cited the *Ragansky* rule with approval. And in *Rothering* we held that a threat upon the life of the President uttered in the nature of a hyperbole is not a defense under § 871.

■ In Watts v. United States, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969), the Supreme Court expressed "grave doubts" about the *Ragansky* and *Pierce* holdings on the interpretation of the "willfulness" requirement, concluding that the statute requires proof of a "true threat". The majority in *Watts*

referred to Judge Wright's dissent in Watts v. United States, 131 U.S.App. D.C. 125, 402 F.2d 676 (1968), rev'd. 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969). There Judge Wright said that the legislative history of § 871 indicates that in order to meet the "willfulness" requirement, the Government must prove that there was a willful expression of an intent to carry out the threat. Since the Supreme Court decision in *Watts,* only one circuit has held that the Government must prove a present intention to carry out the threat. United States v. Patillo, 438 F.2d 13 (4th Cir. 1971). We do not believe that the willfulness element requires that the defendant actually intends to carry out the threat. United States v. Compton, 428 F.2d 18 (2nd Cir. 1970), cert. denied 401 U.S. 1014, 91 S.Ct. 1259, 28 L.Ed.2d 551 (1971); Roy v. United States, 416 F.2d 874 (9th Cir. 1969). The "true threat" requirement of *Watts, supra,* was properly met by the instruction given by the trial court below:

" . . . a threat is knowingly made if the maker of it comprehends the meaning of the words uttered by him, and a threat is willfully made if in addition to comprehending his words, the maker voluntarily and intentionally utters the words as a declaration of an apparent determination to carry out the threat.

*However, before you convict a defendant under this statute, you must be convinced beyond a reasonable doubt that the defendant intentionally made a statement, either written or oral, in a context and under such circumstances that a reasonable person would foresee that the statement would be interpreted by persons hearing or reading it as a serious expression of an intention to inflict bodily harm upon or to take the life of the President of the United States, and you must be further convinced beyond a reasonable doubt that the*

*statement was not the result of mistake, duress or coercion;* however, the statute does not require proof beyond a reasonable doubt that the defendant actually intended to carry out the threat to kill or harm the President." (Emphasis ours).

This instruction eliminated threatening language employed as a result of mistake, duress or coercion, thus effectively taking utterances intended and understood as jokes or political hyperbole out of the "willful" category. *Pierce* and *Rothering* no longer control in this Circuit for their holdings that language threatening the life of or harm to the President obviously uttered as a joke or a hyperbole are not defenses to a prosecution under § 871. The language in the trial court's instruction that the jury must find that the maker had an "apparent determination to carry out the threat," in the context of the entire instruction, is synonymous with "true threat".

We hold that Hart uttered a true threat against the President of the United States when he said he intended to kill him. It was not necessary for the prosecution to prove that Hart actually intended to carry out the threat. In the context of and under the circumstances reflected by this record, Hart's threatening language could not have been reasonably considered to have been uttered in jest or in the nature of a hyperbole.

Hart alleges that his tendered Instructions 1 through 6 should not have been refused by the trial court. They included instructions on criminal intent, burden of proof, insanity and whether the acts were knowingly done. Hart contends that the Court's instructions glossed over these key areas. Our examination reveals that Hart was not prejudiced. The Court's tendered instructions adequately covered each of these matters.

We affirm.