**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Marvin Arnesto CREWS, Jr., Defendant-Appellant.**

No. 84–2211.

United States Court of Appeals, Tenth Circuit.

Jan. 9, 1986.

Leonard D. Munker, Cheyenne, Wyo., for defendant-appellant.

Francis Leland Pico, Asst. U.S. Atty. (Richard A. Stacy, U.S. Atty., Dist. of Wyoming, with him on the brief), Cheyenne, Wyo., for plaintiff-appellee.

Before HOLLOWAY, Chief Judge, LOGAN, Circuit Judge and BROWN *, District Judge.

---

\* Honorable Wesley E. Brown, Senior United States District Judge for the District of Kansas, sitting by designation.

## PER CURIAM.

Defendant, Marvin Arnesto Crews, Jr., appeals his conviction by a jury of making a threat to kill President Ronald Reagan, a violation of 18 U.S.C. § 871. He was sentenced to four years in prison.

On appeal defendant claims that: (1) the prosecution failed to satisfy its burden to prove defendant was sane at the time of the alleged threat; (2) defendant's purported threat came within a psychotherapist-patient privilege; (3) the prosecution violated defendant's First Amendment rights; (4) the district court erred in denying defendant a competency hearing and in not making findings required by 18 U.S.C. § 4244 (current version at 18 U.S.C. § 4241); (5) the district court wrongly refused to appoint a psychiatrist to aid defendant's attorney; (6) cross-examination of the psychiatrists who examined defendant to determine competency violated former 18 U.S.C. § 4244 and Fed.R.Crim.P. 12.2(c); and (7) the court erred in not instructing the jury that defendant must intend to carry out his threat. In addition, defendant's attorney contends that the local district court rules establishing compensation for appointed counsel at rates lower than Congress established in the Criminal Justice Act, 18 U.S.C. § 3006A(d)(1), are void.

This case began with the broadcast of "The Day After," a television movie depicting the nuclear annihilation of Lawrence, Kansas. This presentation, which was accompanied by warnings of its disturbing nature, was followed by a televised panel discussing the movie's frightening implications. Defendant, a voluntary patient in the psychiatric ward of the Veteran's Hospital in Sheridan, Wyoming, viewed both programs. The shows upset defendant, and he requested sedatives from a psychiatric nurse at the hospital. After taking a large dose of antidepressant medication, defendant said to the nurse, "If Reagan came to Sheridan, I would shoot him." R. V, 87. The nurse reported this statement

to the hospital, which then contacted the Secret Service. Defendant denied to an investigating Secret Service agent making that precise statement, but admitted an extreme dislike for President Reagan, and said he had told the nurse that it "would be in the best interest of this nation if that red-necked, bigoted, war-mongering mother fucker were shot." R. V, 65. Defendant owned several weapons, including a shotgun and a rifle.[1] Defendant was indicted for violation of 18 U.S.C. § 871 and found guilty by a jury.

## I

We first treat those issues raised on appeal that will require a judgment of acquittal if we find defendant's arguments convincing.

### A

Defendant claims that the government failed to meet its burden in its case-in-chief of proving that defendant was sane at the time of the threat, and that he therefore was entitled to judgment of acquittal at the close of the government's case.

■ A criminal defendant initially is presumed sane. *United States v. Jacobs*, 473 F.2d 461, 464 (10th Cir.), *cert. denied*, 412 U.S. 920, 93 S.Ct. 2740, 37 L.Ed.2d 147 (1973).[2] Under the law in effect at the time of defendant's trial, however, "when some evidence of insanity is introduced from any source, the presumption of sanity disappears, and the burden is upon the prosecution to prove to the satisfaction of the jury beyond a reasonable doubt that the defendant was sane when he committed the offense charged." *Id.*

■ Defendant contends that the prosecution's statements and testimony elicited

by the prosecution was sufficient to place the burden of proving his sanity on the government. The prosecutor's opening statement did suggest serious questions about defendant's sanity. But opening statements do not constitute evidence; therefore they cannot be used to overcome the presumption that defendant was sane. The only testimony the government introduced in its case-in-chief that even arguably placed defendant's sanity in question was that he was in the psychiatric ward of the Veteran's Hospital and was receiving antidepressant drugs. The government's evidence, viewed as a whole, most strongly indicated that defendant had been hospitalized for alcoholism. The logical inference from the evidence was that defendant had been placed in the psychiatric ward to treat that problem. It would have been unreasonable for the jury to infer that defendant was insane based only on this evidence. Accordingly the district court's denial of Crews' Fed.R.Crim.P. 29(a) motion at the close of the government's case was proper.

Of course, significant evidence of defendant's insanity at the time of the alleged offense came in during defendant's presentation. But through cross-examination of those witnesses, most of whom had treated defendant or examined him pursuant to court order, the government met its burden to produce enough evidence of sanity for the jury to find defendant sane.

### B

Defendant asserts that his statement to the nurse was a privileged communication. The Federal Rules of Evidence do not recognize a psychotherapist-patient privilege explicitly, *see* Fed.R.Evid. 501, and this court has not yet determined whether to

---

1. Defendant had these weapons delivered to him, along with other personal property, from a hospital in Garden City, Kansas, where he had been treated. Although it is unclear when he arranged to have these weapons sent to him in Sheridan, apparently he requested their delivery before the purported threat. Defendant did not have control over the weapons at the Veteran's Hospital. But if he had left the hospital, he would have been entitled to take them with him.

2. Under the Insanity Defense Reform Act of 1984 "the defendant has the burden of proving the defense of insanity by clear and convincing evidence." 18 U.S.C. § 20. This case, however, was tried before the Insanity Defense Reform Act was adopted, and therefore its provisions do not apply.

recognize such a privilege. Other federal courts, however, have adopted it. *See, e.g., In re Zuniga,* 714 F.2d 632, 638–39 (6th Cir.), *cert. denied,* 464 U.S. 983, 104 S.Ct. 426, 78 L.Ed.2d 361 (1983). *See generally* Note, *Evidence—The Psychotherapist-Patient Privilege—The Sixth Circuit Does the Decent Thing: In re Zuniga,* 33 U.Kan.L.Rev. 385 (1985).

The instant case presents the problem in a most peculiar posture. Making the threatening statement is itself the crime. Thus arguably the situation is analogous to one in which the doctor is criminally assaulted or witnesses a criminal assault. Unlike an assault, however, the patient's criminal act is a verbal communication of the type that may be expected or even encouraged in a psychiatric setting, because the treating physician needs to know what the patient is thinking or feeling.

As interesting as this question is, we believe that we need not, and should not, decide in this case whether to adopt the psychotherapist-patient privilege. Even if we were to recognize it, we would have to hold that defendant waived his right to the privilege. The Secret Service agent interviewing defendant testified as follows:

"I made it a point to tell Mr. Crews that he was not in custody, he was not under arrest; that he could leave that interview room, leave that part of the hospital at anytime and go back to where he was before he came over or to go wherever he chose; that I was not restraining his freedom in any way. And if he would talk to me I would appreciate it, but I could not force him nor did I want to indicate to him that he was being forced to stay there.

He acknowledged that he understood he was not under arrest, that he was not in any type of custody, and he stated that if he decided he would leave, he would go ahead and tell me that he didn't want to answer any more questions and he would leave. After he advised me of that I formally advised him of his *Miranda* warning or his rights under the Constitution by reading to him from a *Miranda* card that I carry with me in my credentials.

... I asked Mr. Crews, 'Do you understand each of these rights as I have explained them to you?' And he acknowledged that he understood each of his rights."

R. V, 55–57.

■ Following this receipt of his *Miranda* warning, defendant openly discussed with the agent the comment that he made to the nurse. Disclosure of his own version of the conversation in these circumstances is a waiver of privilege. *See Central Soya Co. v. Geo. A. Hormel & Co.,* 581 F.Supp. 51, 52–53 (W.D.Okla.1982); *United States v. Mierzwicki,* 500 F.Supp. 1331, 1334 (D.Md.1980).

■ We of course recognize that "[w]aiver is not an apposite concept where we premise a defendant so deranged that he cannot oversee his lawyers." *Pate v. Robinson,* 383 U.S. 375, 388, 86 S.Ct. 836, 843, 15 L.Ed.2d 815 (1966) (Harlan, J., dissenting). Yet for purposes of admitting evidence during trial we must assume that defendant was competent at the time of his action unless there is evidence to the contrary. The judge had found him competent to stand trial and the jury must determine whether defendant was competent at the time he made the alleged threat.

#### C

Defendant contends that his statement was protected political speech under the First Amendment. In *Watts v. United States,* 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969), the Supreme Court held that under § 871 the government must prove that a "true threat" was made; crude "political hyperbole," for example, does not constitute a true threat. *Id.* at 708, 89 S.Ct. at 1401. The Court in *Watts* therefore reversed the conviction of an 18-year-old who, while discussing police brutality and the draft immediately after a rally at the Washington Monument, allegedly threatened President Lyndon Johnson. Since *Watts,* the Second Circuit has stated

that, to avoid First Amendment protection, the government must show that a threat "according to [its] language and context conveyed a gravity of purpose and likelihood of execution so as to constitute speech beyond the pale of protected 'vehement, caustic ... unpleasantly sharp attacks on government and public officials.'" *United States v. Kelner,* 534 F.2d 1020, 1026 (2d Cir.) (quoting *New York Times v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964)), *cert. denied,* 429 U.S. 1022, 97 S.Ct. 639, 50 L.Ed.2d 623 (1976).

█ We find that defendant's statement here was a banal threat more akin to those we often see in instances of extortion than to protected political speech. Although the statement was provoked by the panel discussion following "The Day After," the statement is more analogous to that made in *United States v. Welch,* 745 F.2d 614 (10th Cir.1984), than to that made in *Watts.* In *Welch* the defendant, distraught about the unavailability of vocational training, stated that he would kill President Reagan if he had the opportunity. *Welch,* 745 F.2d at 615–16. We found that the First Amendment did not protect the statement. *Id.* at 618; *see also United States v. Howell,* 719 F.2d 1258, 1260–61 (5th Cir.1983) (statement that "It's too bad that John Hinckley did not get him. I will kill the President if I get a chance" not protected by First Amendment), *cert. denied,* —— U.S. ——, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1985); *United States v. Lincoln,* 589 F.2d 379, 382 (8th Cir.1979) (letter containing explicit threats unprotected by First Amendment).

█ Defendant's statement, like that in *Watts,* had political overtones because of its context. But a compelling government interest in protecting the President justifies imposition of criminal liability when it is reasonably clear that the defendant was not engaged in political advocacy.[3] *Howell,* 719 F.2d at 1260 & n. 1. Ultimately the question of whether defendant's statement was political speech was a jury question. *See United States v. Lincoln,* 589 F.2d at 382; *United States v. Kelner,* 534 F.2d at 1025. In the instant case the court instructed the jury that "[a] threat is a statement expressing an intent to kill or injure the President, and a true threat means a serious threat as distinguished from words uttered as mere political argument, talk, or jest." R. VI, 345. This instruction adequately apprised the jury of the distinction between protected political speech and unprotected threats. We are satisfied that the jury's determination that this was not political speech has adequate support in the record.

## II

We next consider defendant's contentions on appeal that will require reversal for a new trial if we find the arguments meritorious.

### A

Defendant complains that the district court did not hold a competency hearing pursuant to defendant's request under 18 U.S.C. § 4244 (current version at 18 U.S.C. § 4241),[4] and did not make any finding that defendant was competent before assigning the case for trial. The trial court did order defendant examined to determine his competency to stand trial by a psychiatrist at the Medical Center for Federal Prisoners at Springfield, Missouri. It already had ordered him examined by a Wyoming psychiatrist, Arthur N. Merrell, M.D., upon the government's motion, after defense counsel had informed the court that defendant would rely on an insanity defense. Dr.

---

3. Defendant also argues that his statement was not a "true threat" because it was contingent on President Reagan coming to Sheridan, Wyoming. This court rejected an identical argument in *Welch,* 745 F.2d at 618–19.

4. The Insanity Defense Reform Act of 1984 amended 18 U.S.C. §§ 4241–4247. Pub.L. No. 98–473, § 403(a), 98 Stat. 1837, 2057–68. These amendments, however, were adopted after trial of this case and thus do not apply. All further references refer to the pre-Act version of § 4244.

Merrell and William S. Logan, M.D., of the Springfield Medical Center gave reports to the court. Both doctors extensively discussed defendant's serious mental problems, but both found defendant competent to stand trial.

■ The trial court held no evidentiary hearing on competency and made no express finding of competency, as far as we can ascertain from the record. It did, however, order defendant to stand trial, which we believe constitutes a finding that defendant was sufficiently competent to "understand the proceedings against him [and] assist in his own defense." 18 U.S.C. § 4244 (amended 1984); *Wolcott v. United States*, 407 F.2d 1149, 1150 (10th Cir.), *cert. denied*, 396 U.S. 879, 90 S.Ct. 156, 24 L.Ed.2d 137 (1969).

■ If the court had held a hearing and thereafter made a finding that defendant was competent to stand trial, that would be a fact finding we could set aside only if we found it to be clearly erroneous or arbitrary. *Id.* at 1155; *see also United States v. Voice*, 627 F.2d 138, 141 (8th Cir.1980); *United States v. Caldwell*, 543 F.2d 1333, 1349 (D.C.Cir.1974), *cert. denied*, 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976). We have held, however, that a trial court need not conduct a competency hearing when there has been only minimal or no evidence of incompetence. *United States v. Dunn*, 594 F.2d 1367, 1371–72 (10th Cir.), *cert. denied*, 444 U.S. 852, 100 S.Ct. 106, 62 L.Ed.2d 69 (1979); *Kienlen v. United States*, 379 F.2d 20, 29 (10th Cir.1967). In reviewing whether the trial court should have held a competency hearing, we must determine "whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." *de Kaplany v. Enomoto*, 540 F.2d 975, 983 (9th Cir. 1976) (en banc), *cert. denied*, 429 U.S. 1075, 97 S.Ct. 815, 50 L.Ed.2d 793 (1977). Also, when no competency hearing was held, there is no res judicata effect and our review on appeal is not limited by the clearly erroneous standard. *See United States v. Johns*, 728 F.2d 953, 956 (7th Cir.1984) (review comprehensive absent judicial determination); *de Kaplany*, 540 F.2d at 983 (review comprehensive absent hearing); *see also Kienlen*, 379 F.2d at 29 (competency issue may be raised in collateral proceedings); *Krupnick v. United States*, 264 F.2d 213, 217 (8th Cir.1959) (same).

■ To raise a substantial question requiring a competency hearing there must be some evidence to create doubt on the issue. Merely raising the issue is insufficient. The only evidence presented to the court before the trial in this case was that defendant was a hospitalized mental patient at the time of the alleged crime and that he suffered from the mental illnesses recited in the reports of Drs. Merrell and Logan. In light of the psychiatrists' conclusions that defendant was competent to stand trial, however, we cannot say the trial court erred in failing to hold an evidentiary hearing.

Nevertheless, this issue is intimately related to the one we next consider: the defendant's right to have a psychiatrist appointed to assist the defense. An indigent defendant without the assistance of a psychiatrist is handicapped in presenting evidence that may create sufficient doubt of his competency to deserve a hearing. Because we find that a psychiatrist must be appointed to assist the defense, and that defendant must be retried, the issue of competency to stand trial again may become an issue the district court must reconsider.

## B

Defendant also claims that the district court erred in refusing to appoint him a psychiatrist to help in his defense pursuant to 18 U.S.C. § 3006A(e)(1). Although at one point the court apparently agreed to give defendant a psychiatrist, it appears that the court later changed its decision because no local psychiatrist was available.

■ This court recently has recognized that an indigent defendant raising an insan-

ity defense is entitled to the aid of a psychiatrist. *United States v. Sloan*, 776 F.2d 926, 927–29 (10th Cir.1985) (citing *Ake v. Oklahoma*, —— U.S. ——, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) ). Such a psychiatrist is necessary not only to testify on behalf of the defendant, but also to help the defendant's attorney in preparing a defense. *Id.* In the instant case, this second element was critical. Although four treating or court-appointed psychiatrists testified with respect to Crews' mental condition, Crews also was entitled to the appointment of a psychiatrist "to interpret the findings of ... expert witness[es] and to aid in the preparation of his cross-examination." [5] *Sloan*, at 929.

■ The testimony of the government-appointed psychiatrists, and those who had treated defendant at the Veteran's Hospital, involved technical psychiatric diagnoses of defendant's mental condition. Furthermore, there was testimony concerning whether the source of defendant's condition was organic and treatable through drugs. In light of the critical role that psychiatric testimony played in this case, the expert assistance of a psychiatrist was indispensable if defendant was to receive a reasonably fair trial. Such assistance was wrongly withheld.

### C

■ Defendant claims that the testimony of Dr. Logan, the psychiatrist who conducted a competency examination pursuant to 18 U.S.C. § 4244, was improper. Section 4244 provided that "[n]o *statement* made by the accused ... shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding." 18 U.S.C. § 4244 (emphasis added). Dr. Logan did not in fact recount any *statements*

that defendant made to him. He instead confined his testimony solely to his own opinion of defendant's mental condition. This court previously has approved of such testimony as long as the witness does not repeat the substance of actual statements defendant made during the competency examination. *See United States v. Cassidy*, 571 F.2d 534, 537 (10th Cir.), *cert. denied*, 436 U.S. 951, 98 S.Ct. 2859, 56 L.Ed.2d 793 (1978).

■ Defendant makes a related objection to the testimony of Dr. Merrell, who examined defendant pursuant to Fed.R. Crim.P. 12.2(c), to determine if he was sane at the time he made the threat. Rule 12.-2(c) provides, in pertinent part, that:

"No statement made by the defendant in the course of any examination provided for by this rule, whether the examination be with or without the consent of the defendant, no testimony by the expert based upon such statement, and no other fruits of the statement shall be admitted in evidence against the defendant in any criminal proceeding *except on an issue respecting mental condition on which the defendant has introduced testimony.*"

Fed.R.Crim.P. 12.2(c) (emphasis added). We have reviewed the testimony of Dr. Merrell and find that his testimony was confined entirely to comments directly concerning defendant's "mental condition."

Accordingly defendant's objections to the testimony of both Dr. Logan and Dr. Merrell are unfounded.

### D

■ The final contention relating to the trial of the case is that the court erred in instructing the jury that defendant could be convicted absent proof of an intention to

---

5. In *Sloan* we stated that an indigent defendant is entitled to a psychiatric expert only upon "a clear showing to the trial judge that his mental condition will be a significant factor at trial...." *Sloan*, at 929. The court here had before it the psychiatric reports of Drs. Logan and Merrell. These reports, despite stating that defendant was competent both at the time of the alleged offense and at trial, also demonstrated

that substantial questions existed concerning his mental condition. Further, the fact that defendant was a hospitalized mental patient at the time the alleged crime was committed would be a relevant factor to consider in determining whether to appoint a defense psychiatric expert if defendant did not have access to his own psychiatrists.

carry out the threat.[6] We must remember that the indictment in this case was based on the statement defendant made to the nurse. Defendant was not indicted for the statement he made to the Secret Service agent, and, indeed, the statement to the agent that it would be in the best interest of the nation if the President were shot is not a threat by defendant himself to kill the President.

 We find no error in the refusal of the trial court to instruct that defendant could in these circumstances be convicted only if he had an intention to carry out the threat. We have rejected that contention in substance in *United States v. Welch,* 745 F.2d 614 (10th Cir.1984); *United States v. Dysart,* 705 F.2d 1247 (10th Cir.1983); and *United States v. Hart,* 457 F.2d 1087 (10th Cir.), *cert. denied,* 409 U.S. 861, 93 S.Ct. 150, 34 L.Ed.2d 108 (1972). Unlike the dissenting judge, we are not persuaded that there is a dichotomy in the statute that would require the intent to carry out the threat to be proved when the threat is not made to the President or in such a way as to reach him or those charged with his protection. The statute speaks of the requirement being that the threat is "knowingly and willfully" made, and, of course, it must be made in terms of a "true threat" as defined by the Supreme Court in *Watts v. United States,* 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (per curiam).

### III

The final issue in this case is unrelated to the validity of defendant's conviction. Instead it focuses on whether the United States District Court for the District of Wyoming may establish a local fee schedule for attorneys entitled to compensation under the Criminal Justice Act, 18 U.S.C. § 3006A, that pays less than Congress provided.

Defendant's attorney submitted a voucher to the court for $945.00. This included $150.00 for the services of a medical expert. The district court, in accordance with the local rules of that court, reduced the amount to $375.00 and completely disallowed compensation for the medical expert expenses.

Unlike § 3006A(d)(1), which establishes hourly rates of compensation, the Wyoming rules base compensation on a daily rate according to time spent in trial. Civil and Criminal Rules of the United States District Court for the District of Wyoming, Appendix F. For a two-day trial, an attorney is entitled to no more than $375.00, regardless of the number of hours worked. *Id.,* Appendix F, at 68. The federal provision in effect at the time of defendant's trial provided:

"Hourly rate.—Any attorney appointed pursuant to this section or a bar association or legal aid agency or community defender organization which has provided the appointed attorney shall, at the conclusion of the representation or any segment thereof, be compensated at a rate not exceeding $30 per hour for time expended in court or before a United States magistrate and $20 per hour for time reasonably expended out of court, *or such other hourly rate, fixed by the Judicial Council of the Circuit,* not to exceed the minimum hourly scale established by a bar association for similar services rendered in the district. Such attorney shall be reimbursed for expenses reasonably incurred, including the costs of transcripts authorized by the United States magistrate or the court."

18 U.S.C. § 3006A(d)(1) (emphasis added) (amended 1984).

 The language of the federal statute thus makes clear that the statutory fee schedule could be changed only by the Judicial Council of the Circuit after considera-

---

**6.** The court gave the following instruction:
"In a prosecution for threats against the President, it is not necessary to show that the Defendant intended to carry out the threat. For it is necessary to prove that the Defendant actually had the apparent ability to carry out the threat. The question is whether those who hear the threat reasonably consider that an actual threat has been made. It is the making of the threat, not the intention to carry it out, that violates the law."

tion of the minimum fee schedule of the local bar. *See Mills v. United States,* 713 F.2d 1249 (7th Cir.1983), *cert. denied,* 464 U.S. 1069, 104 S.Ct. 974, 79 L.Ed.2d 212 (1984). Although our judicial council did approve the Criminal Justice Act plan of the district court of Wyoming, it did not approve of these compensation limits.[7]

Accordingly the district court rule is void and defendant's attorney shall be reimbursed for his expenses, including the cost of hiring a medical expert, in accordance with the fee schedule set out in 18 U.S.C. § 3006A(d)(1) and (2) and (e)(2) (amended 1984).

- - - -

For the reasons discussed above, defendant Crews' conviction is vacated. The district court shall appoint defendant a psychiatrist to aid in his preparation for a new trial.

REVERSED and REMANDED.

LOGAN, Circuit Judge, dissenting in part:

I concur in all of the decision except Part II D, treating the necessity for an instruction that defendant must have intended to carry out his threat.

When a threat is made *directly* to the President, or in such a manner that it is reasonable to expect that it would reach the President or the President's security personnel, we have held that it is unnecessary for the government to prove the defendant actually intended to carry out the threat. In *Welch,* for example, proof of actual intent was unnecessary when the defendant repeated his threat against the President to an employee at a state mental hospital, after he had been warned that, if the threat was repeated, it would be reported to the Secret Service. *Welch,* 745 F.2d at 616. In addition, the defendant in *Welch*

repeated his threats to agents investigating his prior remarks. *Id.* at 616, 618. *Welch* thus follows the pattern in this circuit on proof of intent in threat cases. *See, e.g., United States v. Dysart,* 705 F.2d 1247, 1256 (10th Cir.) (threatening letters mailed to President), *cert. denied,* 464 U.S. 934, 104 S.Ct. 339, 78 L.Ed.2d 307 (1983); *United States v. Smith,* 670 F.2d 921, 923 & n. 4 (10th Cir.1982) (threatening letter mailed to President); *United States v. Hart,* 457 F.2d 1087, 1090 (10th Cir.) (threatening call made to FBI), *cert. denied,* 409 U.S. 861, 93 S.Ct. 150, 34 L.Ed.2d 108 (1972).

I agree that this approach is consistent with the purposes of the statute. The primary purpose of § 871 is to ensure the President's safety. When an individual communicates a threat in such a manner that it reaches the President or those charged with his protection, it is permissible to infer an intent to carry out that threat in light of the overwhelming importance of safeguarding the President. The secondary purpose of § 871 is to ensure that threats do not impair the President's movements or ability to perform the duties of that office. *United States v. Patillo,* 438 F.2d 13, 15 (4th Cir.1971) (en banc); *accord Roy v. United States,* 416 F.2d 874, 877 (9th Cir.1969). This secondary purpose is undermined when a threat is communicated to the President or those charged with protecting him, regardless of whether the defendant actually intends to carry it out. Thus proof of intent is, and I think should be, unnecessary in these instances.

When a threat is made that is not intended to reach the President or his protectors, and in a context in which it is highly unlikely to be so communicated, I believe a substantially different situation is presented.

First, when a threat to the President is made to a companion, friend, or as here, a psychiatric nurse administering to the de-

---

**7.** The Wyoming district recently adopted Rule 315, setting compensation at a rate lower than Congress established. The district court does not have authority to pass such a rule and it therefore is void to the extent that its compensation rates differ from 18 U.S.C. § 3006A(d)(1). In addition, we note that under the Criminal

Justice Act Revision of 1984, even the Judicial Council no longer has authority to vary the compensation rates established by Congress. *See* 18 U.S.C. § 3006A(d)(1) (striking "or such other hourly rate, fixed by the Judicial Council of the Circuit,...." ).

clarant, the statement is much more likely to be idle talk or political commentary. We must recognize this is so even though we approve of charging a jury that it must measure the "true" nature of the threat by how the hearer would interpret it.

Second, under 18 U.S.C. § 871 the very utterance of a threat is punishable. This comes very close to punishing mens rea alone. Ordinarily, for criminal liability to attach, there must be an act in addition to the requisite intent. This ensures that an individual is not punished merely for having evil thoughts. When a threat is communicated to the purported victim, the act of communication itself corroborates the intent. Therefore, actual intent to carry out the threat need not be shown. Actual intent is presumed from the communication or attempt to communicate the threat. When a threat is not communicated nor intended to be communicated to the object of the statement, however, some further evidence that the individual has done more than think evil thoughts ought to be shown. Proof of actual intent to carry out the threat is needed to demonstrate the reality of the threat itself. Any other rule vests far too much power in the government at the expense of the individual.

Finally, when a threat is made to one not intended to carry the message to the President or his protectors, and in circumstances highly unlikely to reach those people, the threat does not reasonably impair the President's movement or his ability to perform the duties of his office. In that case the only justification for punishing the utterer would seem to be if a real danger to the President exists. I would therefore hold that the government in such a case must prove actual intent to carry out the threat.

The Fourth Circuit recognized this principle in *United States v. Patillo*, 431 F.2d 293, 297–98 (4th Cir.1970), *aff'd*, 438 F.2d 13 (en banc) (1971). In *Patillo* the defendant told a fellow employee that he was going to kill President Richard Nixon. *Patillo*, 431 F.2d at 294. The employee informed his supervisor, who in turn informed the Secret Service. *Id.* A Secret Service agent then secreted himself in the trunk of the defendant's car, where the agent heard the defendant again threaten the President. *Id.* at 294–95. The Fourth Circuit held en banc that when a "threat against the person of the President is uttered *without communication to the President intended*, the threat can form a basis for conviction under the terms of Section 871(a) only if made with a present intention to do injury to the President." [1] *Patillo*, 438 F.2d at 15 (emphasis added). Although this intent can be presumed when a threat is published, it cannot be presumed when the threat is made in a context unlikely to reach the President or his protectors. *Id.* at 15–16.

In the case before us the threat was made in a manner inherently unlikely to reach the President or his protectors. When a patient in the psychiatric ward of a hospital utters to a nurse who is treating him a threat against the President, and that patient has been undergoing treatment expressly designed to help him control such outbursts, it is unreasonable to assume that he intended or believed that the threat would be reported to law enforcement authorities. Accordingly, in the circumstances of this case, I believe defendant was entitled to an instruction that the prosecution must prove that he intended to carry out his threat. Therefore, I respectfully dissent from the majority's position on this issue.

---

**1.** I recognize that several courts have questioned the *Patillo* standard. None of the cases, however, involved facts at all similar to those in *Patillo* or the case before us. *See, e.g., United States v. Callahan*, 702 F.2d 964, 966 (11th Cir.) (threatening letter mailed to president-elect), *cert. denied*, 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983); *United States v. Kirk*, 528 F.2d 1057, 1063 (5th Cir.1976) (threat communicated to Secret Service); *United States v. Rogers*, 488 F.2d 512, 514 (5th Cir.1974) (threat against President made to local police), *rev'd on other grounds*, 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975). Although I agree with the holdings in these cases, I would not extend them to "uncommunicated" threats of the sort involved in the instant case.