UNITED STATES of America,
Plaintiff-Appellee,

v.

Douglas Jackson DYSART,
Defendant-Appellant.

No. 81–2251.

United States Court of Appeals,
Tenth Circuit.

April 11, 1983.

**1248**

Mary G. Allen, Allen, Foreman & Mueller, Denver, Colo., for defendant-appellant.

Richard J. Smith, Asst. U.S. Atty., Albuquerque, N.M. (William L. Lutz, U.S. Atty., Albuquerque, N.M., was on brief), for plaintiff-appellee.

Before SETH, Chief Judge, and HOLLOWAY and BARRETT, Circuit Judges.

HOLLOWAY, Circuit Judge.

Defendant-appellant Douglas Dysart appeals from his conviction for threatening to take the life of the President of the United States, in violation of 18 U.S.C. § 871. Dysart was sentenced to three years' imprisonment. The only contested factual issue at trial was Dysart's sanity at the time of the offense, or as his counsel stresses, "all *mens rea* issues" pertaining to defendant's conduct.

For reversal, Dysart argues that (1) the testimony of a Government witness was improperly admitted (a) since the trial court permitted the witness, a doctor of osteopathy, to state his opinion on the defendant's competency without first ruling on his qualification to testify as an expert, (b) since the trial court abused its discretion by allowing a doctor of osteopathy to testify as an expert in psychiatry, and (c) since the witness was allowed to testify as to statements made by Dysart during the course of examination of him as to competency to stand trial, pursuant to 18 U.S.C. § 4244; (2) that the trial court erred by refusing to instruct the jury that § 871 requires proof that Dysart intended his threat to be taken as a threat and by refusing to instruct the jury that evidence as to insanity might be considered in determining whether Dysart was capable of forming the requisite specific intent, and (3) that the court erred by admitting testimony concerning alleged prior threats against the President by the defendant.

**I**

Viewing all the evidence, direct and circumstantial, together with all reasonable inferences therefrom, in the light most favorable to the Government as we must on this appeal from a guilty verdict, *United States v. Twilligear*, 460 F.2d 79, 81–82 (10th Cir.), the evidence tended to show the following facts.

On May 4, 1981, Lou Culbraith, an employee of the United States Postal Service in the White House, opened an envelope addressed to the White House (Pl.Ex. 1)[1] which contained the following handwritten message (Pl.Ex. 2):

Apt. 14
721 N. Alameda
Las Cruces, N.M.
88001

---

1. Culbraith's job is opening the President's mail. (II R. 30).

April 9, 1981

Dear Mr. Reagan:

I am going to fly to Washington and am going to assassinate you on May 5, 1981.

Sincerely,
Douglas Dysart
Senior Systems Analyst
Disabled

P.S. I am the grandson of Florence Jackson, and the great-nephew of Brig. Gen. Bonner Fellers, military secretary, Gen. Douglas MacArthur Pacific + Korea.

I am sorry, but things medical and mental have reached a threshhold (sic) in my life.

Dysart stipulated to the authorship and mailing of the letter as well as a second handwritten letter received in the White House mail room two days later which read as follows (Pl.Ex. 3):

Apt. 14
721 N. Alameda
Las Cruces, N.M.
88001

4/13/81

Dear Mr. Reagan:

I want to apologize to you and the secret service for saying, in a letter, Thursday, that I was going to fly to Washington on May 5, and attempt to assassinate you. My grandmother, from Cleveland, really was Florence Jackson (maiden name) related to President Andrew Jackson. And my great-uncle really was Brigadier General Bonner Fellers who was the military secretary to Doug MacArthur in the Pacific and Korea.

I am quite proud of my family heritage and would never want to do anything that would cause harm or slight to befall you. Here is to a speedy and good recovery.

Yours,
Douglas Dysart

The letters were turned over to the Secret Service and Dysart was arrested in May 1981. Immediately after his arrest Dysart signed a statement indicating that on April 9, 1981, he wrote a letter to President Reagan threatening him with assassination and another letter on April 14, 1981, apologizing for the first letter.[2]

On the Government's motion, the district court ordered that Dysart be examined by a qualified psychiatrist pursuant to the provisions of 18 U.S.C. § 4244 in order to determine "whether the defendant was insane or otherwise so mentally incapacitated as to be unable to understand the proceedings against him or to properly assist in his own defense ...." (I R. 5). Dr. James R. Leach, Chief of Forensic Psychiatry at the Medical Center for Federal Prisoners at Springfield, Missouri, found that Dysart was mentally competent to stand trial. Defense counsel then moved for another evaluation pursuant to § 4244 claiming, *inter alia,* that fairness required that Dysart "be examined by independent, disinterested experts." (I R. 9). The trial court granted the motion, ordered that Dysart be examined by Dr. Henry W. Blake, a qualified psychiatrist, and Dr. Blake also found Dysart competent to assist in his own defense. (I R. 12).[3]

---

**2.** In pertinent part the statement was as follows (Pl.Ex. 8):

On April 9, 1981 while living at 721 N. Alameda, Apt 14, Las Cruces, New Mexico, I was drunk and I was listening to the radio. I heard that a guy named "Richardson" had been arrested in New York for threatening the President. So I sat down and wrote a letter to President Reagan in which I said "I was going to fly to Washington and assassinate him on May 5, 1981". (Sic) I then walked up to the post office and mailed the letter. On April 14, 1981 I wrote another letter to President Reagan to apologize to him and the Secret Service for writing the first letter.

\* \* \* \* \* \*

Special Agent Lee Tracy has shown me a copy of the first letter which I wrote to President Reagan and I have initialed it "DMD 5–12–81."

Douglas M. Dysart
5–12–81

**3.** Though Dr. Blake did not testify at the competency hearing or the trial, his findings were made a part of the record. (II R. 4). We note that § 4244 requires only that the examining psychiatrist "report to the court" and not that

Subsequently the court conducted a competency hearing in September 1981. The only witness testifying at the hearing was Dr. Leach. Vigorous objections were made to his qualifications to testify as an expert.[4] The objections were overruled, the court allowed Dr. Leach to testify as an expert, and the trial court found defendant Dysart competent to stand trial. (II R. 22). This finding and the procedure leading to it are not challenged on appeal, although strenuous arguments are made on the issue of competency at the time of the offense, which will be treated later.

Before trial defendant Dysart notified the Government and the court of his intention to assert the defense of insanity or lack of mental capacity at the time of the commission of the offense. *See* Rule 12.2(a), F.R.Crim.P. The Government responded by a motion pursuant to Rule 12.2(c) that Dysart "be examined by a psychiatrist for purposes of determining his mental condition at the time of the alleged offense charged . . . ." (I R. 19). The trial court then ordered that Dysart be examined by Dr. Thomas C. Thompson in order to determine Dysart's mental state at the time of the offense. (I R. 21). Dr. Thompson's findings were favorable to the defendant and he testified at trial for Dysart. Dr. Thompson testified that Dysart had a long chaotic history of inability to function, characterized by an underlying thought disorder, described as basically a chronic schizophrenic, paranoid in nature. He said that at the writing of the April 9, 1981, letter Dysart did not have the capacity to understand and appreciate the wrongfulness of his conduct and did not have the capacity to form the specific intent to convey a threat to the President. (II R. 128, 136–37).

In addition, there was testimony by a licensed practical nurse who served as the county medical officer for Dona Ana County, James West. West testified that Dysart had been committed some eleven times dur-

ing the past twelve years to the Las Vegas medical hospital. He described several episodes of bizarre conduct while Dysart was in the jail in January 1981 and while in jail in connection with the instant charge, including *inter alia,* removing his clothes, exhibiting himself to jailers and matrons, relieving himself into the main hallway, throwing lighted paper at people, smearing food on himself and his cell, and smearing feces in the cell. (II R. 116–18).

Dr. Leach also testified at trial for the Government and the content of his testimony was substantially similar to that during the competency hearing. After he detailed his education and qualifications, defense counsel again objected to his qualifications, stating (II R. 82):

> "Your Honor, I'd like to object, for purposes of the record. As I understand, he testified that his medical graduate degree is a Doctor of Osteopathy, which I understand to be a doctor that specializes in bone structure of the body."

And the trial court responded (*id.*):

> "Fine, he may go ahead."

Dr. Leach testified that he and the Springfield staff examined Dysart starting on May 14, 1981. He diagnosed Dysart as an alcoholic. However Dr. Leach said that he did not see any evidence of Dysart's having a paranoid schizophrenic personality disorder. He concluded that on April 9 (the date of the first letter to President Reagan), Dysart was mentally capable of knowing what he was doing, was mentally capable of knowing it was wrong, and was mentally capable of controlling his conduct. (II R. 92, 94, 104).

Further evidence will be detailed as necessary in discussing Dysart's appellate contentions.

## II

### A.

Dysart contends that the admission of the testimony of Dr. Leach constituted reversi-

---

he testify at the competency hearing. *United States v. Winn,* 577 F.2d 86, 92 (9th Cir.); *United States v. Shepard,* 538 F.2d 107, 109 (6th Cir.).

4. These same objections were made when Dr. Leach testified at trial and the objections will be discussed below.

ble error due to the trial court's failure to determine whether the witness was qualified to testify as an expert before admitting his testimony on the issue of Dysart's sanity at the time the letters were written, citing Rules 104(a) and 702 of the Federal Rules of Evidence. (Brief of Appellant at 11–12).

■ We cannot agree. Rule 104(a) provides that "[p]reliminary questions concerning the qualification of a person to be a witness ... shall be determined by the court." The court's responsibility to determine these preliminary questions of qualification to testify is greatly reduced by Rule 601 which, with exceptions inapplicable to the present case, makes all witnesses competent.[5] "The judge, however, does retain his power to decide preliminary questions with regard to the qualification of expert witnesses under Rule 702." 1 Weinstein's Evidence ¶ 104[03].[6] Neither Rule 702 nor any other rule or precedent, however, sets forth a specific method by which the trial judge must determine the qualification of an expert. The court's statement that the witness might "go ahead," after hearing the objection to his qualifications, in no way violated any procedural rule.

Furthermore, we are not persuaded by Dysart's contention that the trial court did not make a Rule 702 determination. As noted, after Leach testified as to his education and experience Dysart's counsel objected to his qualifications, noting that Dr. Leach is a Doctor of Osteopathy (DO) and stating that a DO is "... a doctor that specializes in bone structure of the body." (II R. 82). The objection provided a proper procedural predicate for the judge to determine Dr. Leach's qualifications. The court's statement, "[f]ine, he may go ahead" (id.), made clear the court's rejection of the challenge to the qualifications of the witness.[7]

### B.

Dysart's second point is that the trial court abused its discretion by allowing a doctor of osteopathy to give a medical opinion as to Dysart's sanity. (Brief of Appellant at 12–13).

■ The record shows that Dr. Leach obtained his undergraduate degree from the University of Texas College of Pharmacy, had pre-medical training at North Texas State University and Texas Wesleyan, received his degree as a doctor of osteopathy from the College of Osteopathic Medicine and Surgery in Des Moines, and worked as an intern at Ft. Worth Osteopathic Hospital for one year and in family practice for six years. Thereafter, he received one year of specialty training in psychiatry at the Kansas City College of Osteopathic Medicine in Kansas City, Missouri, (II R. 78) followed by one and one half years as a staff physician at Osawatomie State Hospital in Kansas[8] and three years of study in general psychiatry at the Meninger School of Psychiatry in Topeka, Kansas. Following this, Dr. Leach received a certificate of completion of a three-year AMA approved residency program. (II R. 79).

■ Acceptance or rejection of an expert witness's qualifications is a matter within the discretion of the trial court, *Wolford v. United States,* 401 F.2d 331, 332 (10th Cir.),

---

5. Rule 601 provides:
   Every person is competent to be a witness except as otherwise provided in these rules. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law provides the rule of decision, the competency of a witness shall be determined in accordance with State law.

6. Rule 702 provides:
   If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

7. As previously noted, the trial court responded likewise to a similar objection posed during Dr. Leach's testimony at the § 4244 competency hearing. *See* II R. 13.

8. Dr. Leach testified that his duties as staff physician at Osawatomie "entailed the physical and psychiatric care of in-patients on a very large psychiatric unit." (II R. 78).

and its rulings will be disturbed only for clear abuse of discretion. *United States v. Samara,* 643 F.2d 701, 705 (10th Cir.), *cert. denied,* 454 U.S. 829, 102 S.Ct. 122, 70 L.Ed.2d 104; 11 Moore's Federal Practice § 702.10[3]. "[A] witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto . . . ." Rule 702, F.R.E. In view of the record of Dr. Leach's training and experience we find no abuse of discretion in the admission of his testimony. *See United States v. Posey,* 647 F.2d 1048, 1051 (10th Cir.).

### C.

Dysart's third claim of error concerning the testimony of Dr. Leach is that crucial parts of his testimony should have been excluded because it was derived from statements made by Dysart during the initial psychiatric evaluation ordered by the court pursuant to 18 U.S.C. § 4244, which provides in part:

> *No statement made by the accused in the course of any examination into his sanity or mental competency provided for by this section, whether the examination shall be with or without the consent of the accused, shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding.* A finding by the judge that the accused is mentally competent to stand trial shall in no way prejudice the accused in a plea of insanity as a defense to the crime charged; *such finding shall not be introduced in evidence on that issue nor otherwise be brought to the notice of the jury.* (Emphasis added).

More specifically Dysart points to Dr. Leach's testimony that he had testified at the § 4244 competency hearing, that during the course of the § 4244 examination, Dy-

sart admitted threatening the life of President Carter, and that he made statements regarding his medical history and described the circumstances surrounding the sending of the letter to President Reagan. He says that admission of such testimony violated § 4244 and his Fifth Amendment privilege against self-incrimination, citing *United States v. Alvarez,* 519 F.2d 1036 (3d Cir.), and *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359. (Brief of Appellant; Reply Brief of Appellant at 5–6). The Government admits that "the better course would have been to avoid questioning Dr. Leach about Dysart's statements made during the § 4244 exam" (Brief of Appellee at 10), but, citing Rule 103(a), F.R.E., claims that Dysart's failure to make a timely objection to Dr. Leach's testimony forecloses consideration of the matter unless admission of the testimony amounted to plain error, which it denies.[9]

The testimony in question was developed during the direct examination of Dr. Leach. Government counsel asked about Dr. Leach's general duties at the Springfield Center and then about his having previously testified concerning Dysart's competency to come to trial. (II R. 81). The doctor then related numerous statements made by Dysart during the § 4244 examination, some concerning the sending of the letter prompting this prosecution. Dr. Leach testified that Dysart said he "was drunk. He said he was drinking." (II R. 87). The doctor's opinion was that Dysart led a boring, unfulfilling life. Dr. Leach testified that Dysart said he had read or heard of a case in New York where someone threatened President Reagan and Dysart decided he would do this "for kicks" and that Dysart said he was sorry he did this and that he wrote a letter of apology four days later. (*Id.* at 88). In addition to Dysart's statements about the events in question, Dr.

---

**9.** Rule 103, F.R.E., in part provides:

(a) Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

(1) Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the

specific ground of objection, if the specific ground was not apparent from the context . . . .

\* \* \* \* \* \*

(d) Plain error. Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court.

Leach testified at length about Dysart's medical history elicited from Dysart covering extensive past psychiatric commitments and treatment. Moreover, Dr. Leach detailed Dysart's statements of having made large numbers of phone calls to the White House and threats to President Carter in 1978. (II R. 86–87).

There is no doubt at all that such testimony was clearly inadmissible in view of the bar of § 4244. Under the statute, a defendant may be compelled to submit to a psychiatric examination to determine his competency to stand trial and the psychiatrist may testify at a hearing held for that purpose. "But that psychiatrist cannot, if the defendant is found to be competent, testify against him at the trial about statements he made in the course of the compelled examination." *United States v. Alvarez,* 519 F.2d 1036, 1044 (3d Cir.). The statute protects the defendant's constitutional privilege against self-incrimination, as the *Alvarez* opinion stresses. *Id.* at 1044.

█ Despite the soundness of the argument premised on § 4244 and the Fifth Amendment, we must agree that the objec-

tions cannot now be urged as grounds for reversal. Defense counsel was obviously alerted to the statute, and to the examination made under it by Dr. Leach. Nevertheless, defense counsel made no objection under § 4244 or the Fifth Amendment. Dysart argues that a "general objection" was made to Dr. Leach's testimony. (Reply Brief of Appellant at 4). However, the objection made in the portion of the record cited by defendant was pointedly directed to Dr. Leach's qualifications and nothing else,[10] and no objection or motion to strike was made which stated the specific ground of objection under § 4244 or the Fifth Amendment, as is required. *See* Rule 103(a)(1), F.R.E.

In addition, we note that Dysart's counsel cross-examined Dr. Leach extensively. This questioning sought to weaken the Government's case on Dysart's competency at the time of the offense. It ranged over the § 4244 examination and the history of the case and also sought to re-emphasize information favorable to defendant such as the defendant's having sent the letter of apology and his health problems.[11] Fur-

---

10. The objection was as follows (II R. 82):
   "Your Honor, I'd like to object for purposes of the record. As I understand, he testified that his medical graduate degree is a Doctor of Osteopathy, which I understand to be a doctor that specializes in bone structure of the body."

11. In part, defense counsel's cross-examination and the responses of Dr. Leach were as follows (II R. 102–06):
   Q. I see. I understand you to mean, then, that the contents of the letter makes no difference with respect to your opinion?
   A. I didn't have the letter. I would have read it had I had access to it, but, no, it would not have made a difference in my opinion.
   Q. Doctor, it didn't occur to you that what was or was not contained in the letters would make any difference in your reaching an opinion?
   A. What was what?
   Q. It didn't make any difference to you what was in the letter?
   A. He told us what was in the letter. He told us not all of this, but he told us fairly well what he mentioned in the letter.
   Q. Did he tell you what he mentioned in the letter of apology?

   A. He only mentioned, as I recall, that he had written a letter of apology saying that he was sorry for having written the previous letter.
   Q. That also contained some sort of dissertation about his relatives or ancestry. Does that seem unusual to you, Doctor?
   A. Sir, I haven't read the letter yet.
   Q. Would you take a moment to read it, please?
   A. Okay.
   Q. As I said, that also contains another dissertation about his relatives or his ancestry?
   A. Yes.
   Q. Does that seem unusual to you?
   A. The middle paragraph, yes, that would be unusual. However, apparently, he had remembered that and he had made reference to it before, and this sort of looks like further clarification or expanding on.
   Q. You're saying, then, that he was drunk when he wrote the letter of apology, too?
   A. I don't know. I don't know that he said that.
   Q. But you don't think the mode or the substance of the letters of threat makes any difference in arriving at an opinion?
   A. That what?
   Q. You don't think either the substance or the mode or the making or the form of those

thermore on cross-examination, the doctor said he thought Dysart intended to threaten the President but he did not think "he intended to kill the President." (II R. 105). Defense counsel brought out through Dr. Leach the fact that Dysart had been drawing disability payments since 1969 and that Dysart told the Springfield staff that this was for a "nervous breakdown." (II R. 99). Without holding that such cross-examination itself constituted a waiver of the § 4244 and Fifth Amendment objections, we do feel that such cross-examination, taken together with the failure to make such objections and the awareness of § 4244 by defense counsel, demonstrate that a trial decision was made to thus attack the Government's sole witness on competency and develop all the favorable information available from him, rather than to make the objections and confine his testimony.

■ Thus, although the defendant was alerted to § 4244 and to the factual background of Dr. Leach's having examined Dysart under that statute alone, no objection based on § 4244 or the Fifth Amendment was made. Evidentiary objections can be waived, even if they have a constitutional footing, particularly where the basic factual and legal predicate for them was available.

threats makes any difference with respect to your arriving at an opinion?

A. No. No, I don't. The fact that he remembered writing them, the fact that he then wrote a letter of apology, the fact that he told us he had been visited on a previous occasion by the Secret Service, the fact that he wasn't on medication when he came and was very, very stable mentally when he came to us, were bases of my opinion. Actually, I started to say a minute ago that the two criteria that we look at in determining criminal responsibility is: Number one, is the defendant able to recognize the wrongfulness of his alleged behavior; number two, is the defendant able to conform his actions to the requirements of law. Those, you see, are the questions that I arrived at, then, in giving an opinion, and I feel that on April 9th, that he knew the wrongfulness and was able to conform.

Q. Do you have an opinion as to whether or not he intended to convey a threat to the President?

A. He told us that he really doesn't have anything against the President.

Q. Basically, what he told you would indicate that he had not intended it as a threat to the President, isn't that correct?

A. That he had not intended what?

Q. That letter as a threat to the President.

A. But you said he had not intended to threaten the President. I think he did intend to threaten the President. I don't think he intended to kill the President.

Q. He was very much impressed, wasn't he, with the fact that some other guy had made a threat and had gotten shown on TV?

A. Maybe that was the motivation. He had simply told me that he had heard of a man in New York that had threatened the President. So, he thought he would do this, too.

Q. He also further told you, did he not, that he had seen the man on TV?

A. I don't recall that, no, sir. I didn't recall whether he had seen it on TV or read it in the newspaper. I just, in my report, had said that he had knowledge of, I believe, or he had heard of a man in New York that had threatened the President. So, he decided he'd do this, too.

Q. Did he ever express to you and (sic) appropriate reason for having written that letter?

A. Appropriate reason? Writing the letter is inappropriate.

Q. Did he express any ill will towards the President?

A. No, sir. As a matter of fact, on several occasions to me, he mentioned that he is a "non-violent person."

Q. The point I'm getting at is his explanations for why he wrote them would be deemed inappropriate.

A. Well, you're trying to put a word in my mouth to say inappropriate. Actually, I explained to you why he said that he wrote them, as a joke or for kicks.

Q. Did he also tell you that he had an enlargement of the heart problem?

A. Pardon?

Q. Did he tell you he had a problem with an enlargement of the heart?

A. I don't recall. Maybe he did, at the time, but we routinely check it out anyway.

Q. Did he, in fact, have a problem with an enlarged heart?

A. I'd be glad to check the electrocardiogram, if I may. It was not impressive enough for us to order a medical consultation on this. If I may just read the electrocardiogram, "Normal sinus rhythm rate, slight ventricular hypertrophy," and then it says, "concluded probably normal ECG." No.

Q. Can you account for why he would have told you or a member of your staff, then, that he had an enlarged heart?

A. He does have. This shows a slight ventricular hypertrophy. Hypertrophy means an enlargement.

*See United States v. Popejoy,* 578 F.2d 1346, 1350 (10th Cir.); Rule 12(b)(3), F.R. Crim.P. We note that objections to Dr. Leach's testimony that Dysart had made statements about sending the threatening letter to President Reagan are also unpersuasive since defendant Dysart stipulated he had sent the letter. *See Hall v. United States,* 410 F.2d 653, 661 (4th Cir.), *cert. denied,* 396 U.S. 970, 90 S.Ct. 455, 24 L.Ed.2d 436.

■ We are convinced that under the circumstances we should not consider the § 4244 and Fifth Amendment objections raised now for the first time on appeal, and after trial counsel failed to make such objections in a timely fashion when the testimony was given. The evidentiary prohibitions of § 4244 may be waived by a defendant. *See United States v. Madrid,* 673 F.2d 1114, 1120 (10th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 96, 74 L.Ed.2d 88; *United States v. Smith,* 404 F.2d 720, 728 (6th Cir.); *Bailey v. United States,* 248 F.2d 558, 560 (D.C.Cir.), *cert. denied,* 355 U.S. 919, 78 S.Ct. 351, 2 L.Ed.2d 279; *contra Lyles v. United States,* 254 F.2d 725, 741–43 (D.C. Cir.) (Bazelon, J., dissenting) (the accused cannot raise or lower the statutory bar at his will). And although there was a strong defense of incompetency at the time of the offense so that the case was not overwhelming against Dysart but was close,[12] we are not persuaded that we should notice the matter as plain error in a situation where trial strategy not to make such objections was decided with awareness of § 4244,[13] and the objection was not asserted.[14] In sum, we conclude that the arguments grounded on § 4244 and the Fifth Amendment, now asserted for the first time on appeal, should not be considered in this case.

While we are convinced that our conclusion not to consider the objections is correct on this record, we feel constrained to say that the courts and the Government should give special attention to the important protections written into § 4244 and the particular interests they safeguard, the chief one being the constitutional privilege against self-incrimination by a compelled examination. *See United States v. Alvarez, supra,* 519 F.2d at 1044. Disregard of these protections infringes important constitutional rights of the defendant and runs a serious risk of reversal.

### III

Defendant Dysart claims that two errors afflict the jury instructions. First, he says

---

**12.** We note that the jury sent a note to the trial judge during its deliberations. The note asked whether the jury could find out whether, if found guilty, Dysart could "get any type of help." The trial judge's written response was that the question "is one that you should not consider." (II R. 25–26).

**13.** On May 12, 1981, the trial court ordered, pursuant to the Government's motion, the § 4244 examination conducted by Dr. Leach to determine "whether the defendant was insane or otherwise so mentally incapacitated as to be unable to understand the proceedings against him or to properly assist in his own defense...." (I R. 5). The order specifically cited § 4244. On August 7, 1981, Dr. Leach filed his findings with the court (I R. 7) and defense counsel then, knowing that Dr. Leach had found Dysart competent, moved, on August 18, 1981, for further evaluation of Dysart specifically citing § 4244. The trial did not commence until October 5, 1981.

Although defense counsel's motion requested that Dysart be examined "to determine the competency of the [d]efendant at the time of the offense alleged as well as the present competency to stand trial and assist in his own defense" (I R. 9), the trial judge's order (I R. 11) limited the scope of the examination to a § 4244 determination of Dysart's competency to stand trial and assist in his own defense. This limitation was followed in the report of Dr. Blake. While defense counsel requested a dual purpose examination, he was obviously aware of the statute.

**14.** We are not persuaded by *United States v. Davis,* 496 F.2d 1026 (5th Cir.), on which Dysart relies heavily. It does notice as plain error the admission of a finding of competency to stand trial, although it was not objected to and although defendant had introduced an earlier adjudication of incompetency to stand trial. We feel the record in the instant case more clearly shows a trial strategy not to object and so confine Dr. Leach's testimony. We note also that objections were made to the psychiatric testimony in question in *United States v. Alvarez, supra,* 519 F.2d at 1039, 1041, on which defendant Dysart also relies heavily on appeal.

the trial court erred in failing to charge that for conviction under § 871, it must be shown that Dysart intended the letter to be taken as a threat, even if he had no intention of carrying out the threat. Second, he contends the trial judge erred when he refused to give an instruction on the relevance of evidence of Dysart's mental condition to the issue of Dysart's ability to form the requisite intent. Neither contention is persuasive.

### A.

A conviction under § 871 does not require proof that the defendant actually intended to carry out the threat. *United States v. Smith,* 670 F.2d 921, 923 (10th Cir.); *United States v. Hart,* 457 F.2d 1087, 1091 (10th Cir.), *cert. denied,* 409 U.S. 861, 93 S.Ct. 150, 34 L.Ed.2d 108; *United States v. Chasteen,* No. 80–1238 (10th Cir. 8/3/81, unpublished) (slip op. at 6). Instead, the statute requires that the Government must prove a "true 'threat'", *Watts v. United States,* 394 U.S. 705, 708, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664, and the instructions given by the trial court met this requirement (I R. 39 & 42):

> In a prosecution for threats against the President, it is not necessary to show that the defendant intended to carry out the threat, nor is it necessary to prove that the defendant actually had the apparent ability to carry out the threat.

> The question is whether those who hear or read the threat reasonably consider that an actual threat has been made. It is the making of the threat, not the intention to carry it out, that violates the law.

> \* \* \* \* \* \*

> The term "threat" means an avowed present determination or intent to injure presently or in the future. A statement may constitute a threat even though it is subject to a possible contingency in the maker's control. The prosecution must establish a "true threat" which means a serious threat as distinguished from words as mere political argument, talk or jest.

In determining whether words were uttered as a threat, the context in which they were spoken must be considered.

We upheld an instruction similar to that given here in *United States v. Smith, supra,* 670 F.2d at 922–23, & n. 2.

Dysart urges that we depart from this construction and adopt the view expressed in *United States v. Patillo,* 431 F.2d 293 (4th Cir.), *panel opinion adhered to,* 438 F.2d 13, 16, (en banc) where the Fourth Circuit held that for a conviction under § 871, the trier of fact must find that the defendant actually intended to carry out the threat or to incite others to injure the President, or that the communication had a restrictive effect on the free exercise of Presidential responsibilities. We are not persuaded to depart from our interpretation of the statute in our *Smith, Hart* and *Chasteen* opinions, which is the view of several other Circuits as well. *See United States v. Kelner,* 534 F.2d 1020, 1025 n. 6 (2d Cir.). We remain persuaded that the "true threat" requirement of *Watts, supra,* was satisfied by the instruction given here. Furthermore, Dysart's complaint that the instructions did not avoid the risk of conviction for a crude jest or expression of political hostility is clearly untenable in light of the explicit guidance on that point found in the instructions.

### B.

Dysart's second complaint about the charge is that the trial court erred in not giving an additional instruction on the relevance of evidence of mental condition to ability to form the requisite intent for the offense charged, citing Rule 12.2(b), F.R. Crim.P., on mental disease or defect inconsistent with the mental element required for the offense charged. (Brief of Appellant at 20–21).

Under our decisions, a person is not criminally responsible for his conduct if, at the time of the offense, "as a result of mental disease or defect, he lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law."

*Wion v. United States,* 325 F.2d 420, 430 (10th Cir.) (*en banc*), *cert. denied,* 377 U.S. 946, 84 S.Ct. 1354, 12 L.Ed.2d 309. The charge given by the trial court adequately covered Dysart's theory of defense on this issue of insanity. We also feel, however, that the instructions as a whole were sufficient to submit the related issue of whether Dysart's mental condition, even if not viewed as insanity, was such as to prevent his forming the requisite intent to commit the offense charged.[15]

The jury was told that a threat is knowingly made if the maker of it comprehends the meaning of the words uttered by him, and that a threat is willfully made if, in addition to comprehending his words, the maker voluntarily and intentionally utters the words as a declaration of an apparent determination to carry out the threat. Further, the instructions stated that in determining the issue as to intent, the jury was entitled to consider the defendant's state-ments and acts, and all facts and circumstances which might aid the determination of state of mind.

A defendant has no right to have an instruction given in the particular form he desires or with any special emphasis. *United States v. Westbo,* 576 F.2d 285, 289 (10th Cir.); *United States v. Hall,* 536 F.2d 313, 330 (10th Cir.), *cert. denied,* 429 U.S. 919, 97 S.Ct. 313, 50 L.Ed.2d 285. We conclude that the charge as a whole was adequate to permit fair consideration of Dysart's theories of defense.

## IV

Finally, Dysart contends that testimony relating alleged prior threats to the President by Dysart should have been excluded under Rules 403 and 404(b), F.R.E. He claims that this is especially true here since the primary issue at trial was his sanity at the time of the offense and evidence of prior threats to the President had no bear-

---

**15.** The relevant portions of the jury instructions were as follows (I R. 40, 44, & 46):

Under the defendant's plea of not guilty, there is an issue as to his sanity at the time of the alleged offense. The law does not hold a person criminally accountable for his conduct while insane, since an insane person is not capable of forming the intent essential to the commission of a crime.

The sanity of the defendant at the time of the commission of the alleged offense is an element of the crime charged and must be established by the government beyond a reasonable doubt, just as it must establish every other element of the offense charged.

A defendant is insane within the meaning of these instructions if, at the time of the alleged criminal conduct, as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

As used in these instructions, the terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

For the purpose of throwing light upon the mental condition of the accused at the time of the alleged offense, the jury may consider evidence of his mental state both before and after that time. The material issue, however, is whether the defendant was sane or insane at the time of the alleged criminal conduct.

Temporary insanity, as well as insanity of longer duration, is recognized by the law.

If the evidence in the case leaves you with a reasonable doubt as to whether the defendant was sane at the time of the alleged offense, you will find him not guilty, even though it may appear that he was sane at earlier and later times.

\*   \*   \*   \*   \*   \*

You will note that the acts charged in the indictment are alleged to have been done knowingly and willfully. A threat is knowingly made if the maker of it comprehends the meaning of the words uttered by him, and a threat is willfully made if in addition to comprehending his words, the maker voluntarily and intentionally utters the words as a declaration of an apparent determination to carry out the threat.

\*   \*   \*   \*   \*   \*

Intent (or lack of intent) may be proved by circumstantial evidence. Indeed, it can rarely be established by any other means. While witnesses may see and hear or so be able to give direct evidence of what a defendant does (or fails to do) there can be no eyewitness account of the state of mind with which the acts were done (or omitted). But what a defendant does (or fails to do) may indicate intent, or lack of intent, to commit the offense charged.

In determining the issue as to intent, you are entitled to consider any statements made and acts done (or omitted) by the defendant, and all facts and circumstances in evidence in the case which may aid determination of state of mind.

ing on the sanity issue. (Brief of Appellant at 23–25).

More specifically, Dysart complains about the testimony of Government witnesses Wyatt and Tracy. Agent Wyatt testified that in December 1978 his answering service received a telephone call from Dysart. Wyatt quoted Dysart as saying that he was "going to get a Winchester rifle and chase President Carter down Pennsylvania Avenue and shoot him." (II R. 47). Defense counsel did not object to this testimony. Furthermore, agent Tracy testified, over the objection of defense counsel (II R. 60), that in December 1980 Dysart told him that "[w]e are going to get Carter Watusi style." (II R. 63). Dysart says that the purported purpose for introducing the evidence—an attempt to show that the threat charged here was made knowingly and willfully— was unjustified because there is no defense of mistake or accident asserted; that the alleged prior threats had no bearing on the primary insanity defense; and that in any event the inherent prejudice from the evidence outweighed any probative value it had. (Brief of Appellant at 23–25).

Before trial the Government filed notice of its intention to offer evidence of previous threats on the life of the President in order "... to demonstrate that the instant threat was made knowingly and willfully, and in the absence of mistake or accident," citing Rule 404(b).[16] (I R. 20). The Government thus specifically identified for the trial court and the defendant the particular purpose for which the evidence of prior misconduct was offered, which was necessary and proper.[17] It was the Government's burden to show how the proffered evidence is relevant to one or more issues in the case. *United States v. Biswell,* 700 F.2d 1310, 1317 (10th Cir.); *United States v. Mehrmanesh,* 689 F.2d 822, 830 (9th Cir.).

■ Intent was a critical issue. Defendant was attempting to show that no "true threat" to the President was intended; he also made a strong effort to show that he was incompetent and in any event he did not have the capacity to form the intent required to commit the offense. On these issues we must agree that the evidence of the prior threats to the President was relevant. Notice of the insanity defense had been given. The evidence bore on the questions as to whether Dysart here made a "true threat," intentionally and without mistake or accident, and whether Dysart's acts were the result of and occurred during a period of incompetency. Cf. *United States v. Kirk,* 528 F.2d 1057, 1060–61 (5th Cir.) (introduction into evidence of three year old § 871 conviction not error where the defense was lack of criminal intent based on intoxication). The evidence of the extrinsic offense thus involved the same state of mind as did the commission of the charged offense and was not too remote and its value was not substantially outweighed by its prejudicial effect. See *United States v. Biswell, supra,* 700 F.2d 1318; *United States v. Terebecki,* 692 F.2d 1345, 1348–49 (11th Cir.). Furthermore, the evidence of alleged prior threats to the President was evidence of misconduct of the same type and did not merely show a general criminal character to prove action in conformity therewith, which Rules

---

**16.** Rule 404(b), F.R.E., provides as follows:

Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**17.** The full text of the notice provided as follows:

NOTICE OF INTENTION TO OFFER CERTAIN EVIDENCE

THE UNITED STATES gives notice of its intention to offer, at the trial of this cause, evidence that the defendant has on previous occasions communicated threats to the life of the President of the United States. This evidence will be offered for the purposes set forth in *Fed.R.Evid.* 404(b); to demonstrate that the instant threat was made knowingly and willfully, and in the absence of mistake or accident. *United States v. Frederickson,* 601 F[.]2d 1358 (8th Cir., 1979); *United States v. Hall,* 583 F[.]2d 1288 (5th Cir.1978); *United States v. Kirk,* 528 F[.]2d 1057 (5th Cir.1976).

404(a) and (b) specifically prohibit. *See .United States v. Nolan,* 551 F.2d 266, 271 (10th Cir.), *cert. denied,* 434 U.S. 904, 98 S.Ct. 302, 54 L.Ed.2d 191.

We find no error in the admission of the evidence of defendant's prior conduct in these circumstances.

## V

In sum, we conclude that no reversible error in the trial record is demonstrated and accordingly the judgment is

AFFIRMED.