**PLANNED PARENTHOOD OF THE COLUMBIA/WILLAMETTE, INC.; et al., Plaintiffs,**

v.

**AMERICAN COALITION OF LIFE ACTIVISTS; et al., Defendants.**

Civil No. 95–1671–JO

United States District Court, D. Oregon.

Oct. 14, 1998.

Carol J. Bernick, Davis Wright Tremaine, Portland, OR, Stephen S. Walters, Stoel Rives, Portland, OR, Maria T. Vullo, Paul Weiss Rifkind Wharton & Garrison, New York City, Roger Evans, Planned Parenthood Federation of America, Inc., New York City, for Plaintiffs.

William D. Bailey, Bailey & Wolfe, Portland, OR, David T. Daulton, Berean Law Group, Norfolk, VA, Kevin L. Gibbs, Olm-

stead Gibbs & Harper, Seattle, WA, Mark Belz, Belz & Jones, St. Louis, MO, Norman L. Lindstedt, Lindstedt & Buono, Portland, OR, Michael P. Tierney, John M. McSherry, Legal Center for the Defense of Life, New York City, Chris Ferrara, American Catholic Lawyers Association, Fairfield, NJ, for Defendants.

Michael H. Simon, Andrew J. Bowman, Chin See Ming, Perkins Coie, Portland, OR, for amicus curiae American Civil Liberties Union Foundation of Oregon.

## OPINION AND ORDER

ROBERT E. JONES, District Judge.

Plaintiffs Planned Parenthood of the Columbia/Willamette, Inc., Portland Feminist Women's Health Center, and five individual physicians [1] who provide abortions as part of their medical practices (together, "plaintiffs") brought this action against the American Coalition of Life Activists, Advocates for Life Ministries, and fourteen individual anti-abortion activists [2] (together, "defendants"), seeking damages and injunctive relief for defendants' alleged violation of the Freedom of Access to Clinic Entrances Act of 1994 ("FACE"), 18 U.S.C. § 248, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, and the Oregon Racketeer Influenced and Corrupt Organizations Act ("ORICO"), O.R.S. 166.720.[3]

In September 1996, I made numerous rulings in this action on defendants' Rule 12(b) motions to dismiss. In essence, with the exception of the RICO and ORICO claims against defendant Bray, I permitted plaintiffs to proceed on all their claims, subject to my renewed scrutiny on appropriate motion for summary judgment. *See Planned Parenthood of Columbia/Willamette, Inc. v. American Coalition of Life Activists*, 945 F.Supp. 1355, 1378–79 (D.Or.1996) (*"Planned Parenthood I"*). Since then, the parties have been engaged in and have completed extensive discovery.

The case is now before me on the defendants' motions for summary judgment (è203, 206, 211). In addition to the parties' excellent and thorough submissions and arguments, the ACLU Foundation of Oregon, Inc., as *amicus curiae,* filed an informative and helpful brief and participated at oral argument. I have considered the record and the arguments of counsel, and conclude that defendants' motions must be denied, with the exceptions noted below. I also agree with plaintiffs that, based upon the factual record now before the court, defendant Bray should be reinstated as a defendant to plaintiffs' federal and state RICO claims.[4]

## STANDARD

Summary judgment should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). If the moving party shows that there are no genuine issues of material fact, the non-moving party must go beyond the pleadings and designate facts showing an issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact. *United Steelworkers of America v. Phelps Dodge,* 865 F.2d 1539, 1542 (9th Cir. 1989).

The substantive law governing a claim determines whether a fact is material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also T.W. Elec. Service v. Pacific Elec. Contractors,* 809 F.2d 626, 630 (9th Cir.1987). Reasonable doubts as to the existence of a material factual issue are resolved

---

1. The individual plaintiffs are Robert Crist, Warren Hern, Elizabeth Newhall, James Newhall, and Karen Sweigert.

2. The individual defendants are Michael Bray, Andrew Burnett, David Crane, Timothy Dreste, Michael Dodds, Joseph Foreman, Charles McMillan, Stephen Mears, Monica Miller, Bruce Murch, Catherine Ramey, Dawn Stover, Donald Treshman, and Charles Wysong.

3. Plaintiffs have withdrawn their state law claims for intentional infliction of emotional distress.

4. As noted below, I have found defendant Bray in contempt and ordered his default based on his failure to comply with discovery orders.

against the moving party. *T.W. Elec. Service*, 809 F.2d at 631. Inferences drawn from facts are viewed in the light most favorable to the non-moving party. *Id.* at 630–31.

## FACTUAL BACKGROUND

Plaintiffs brought this action for injunctive relief and damages to redress what they characterize as the "campaign of terror and intimidation" the defendants allegedly have waged against them through their organization, the American Coalition of Life Activists ("ACLA"). Specifically, plaintiffs claim that defendants' statements in certain posters and other documents, when viewed in the context of violence against abortion providers, constitute "true threats" for which they may be held liable. Defendants, in turn, maintain that the challenged statements constitute protected speech under the First Amendment for which they may not be held liable.

## A. *THE PARTIES*

### 1. *Plaintiffs.*

The individual plaintiffs are physicians who provide abortions as part of their medical practices. The two clinics, Planned Parenthood of the Columbia/Willamette ("Planned Parenthood") and Portland Feminist Women's Health Center ("Portland Feminist") offer abortion services as well as other reproductive health care services. Planned Parenthood, a not-for-profit corporation organized under the laws of the state of Oregon, operates six clinics in Oregon. Portland Feminist, also a not-for-profit Oregon corporation, operates clinics in Portland and in Eugene, Oregon, under the name All Women's Health Services.

With the exception of plaintiff Sweigert and the two clinic plaintiffs, each of the individual plaintiffs has been the specific target of one or more of the statements alleged to constitute "true threats."

### 2. *Defendants.*

The ACLA, one of the two defendant organizations, is an unincorporated organization based in Portland, with members and activities throughout the United States. The rec-

ord shows that the ACLA formed in 1994, following a doctrinal split in the anti-abortion (or pro-life) movement over the issue of violence. *See, e.g.,* Plaintiffs' Concise Statement, Exhibit 53, p. 1.

Defendant Advocates for Life Ministries ("ALM") also is an unincorporated association that operates principally in Portland. ALM publishes *Life Advocate,* a magazine distributed nationally and internationally. The record shows that *Life Advocate* has published articles that endorse interference with and obstruction of abortion services through, among other things, use of force. *See, e.g.,* Plaintiffs' Concise Statement, Exhibit 61.

With the exception of defendant Bray, the individual defendants are present and former directors of the ACLA and have been actively involved in its activities, among other things. In addition to his role as a director of the ACLA, defendant Burnett is one of the founders of the ACLA, the executive director of ALM, and the publisher of *Life Advocate* magazine. Burnett also published Bray's treatise, *A Time to Kill,* and has marketed and distributed the treatise nationwide. Plaintiffs describe the treatise as an "attempt[ ] to justify revolution and vigilante violence" against abortion providers. Amended Complaint, ¶ 19.

Defendant Bray, who previously spent 46 months in federal prison for conspiring to bomb 10 clinics, authored *A Time to Kill.* Although I previously dismissed the RICO and ORICO claims against Bray,[5] based upon the evidence of record, I am now satisfied that there is at least a genuine issue of material fact as to whether Bray participated sufficiently in the "operation and management" of the ACLA as to be potentially liable on plaintiffs' racketeering claims and that those claims should be reinstated against him. Moreover, based on Bray's refusal to comply with discovery orders, plaintiffs moved for an order of contempt against him, which I granted in part during oral argument on September 29, 1998. At that time, I also ruled that if defendant Bray did not submit to a further deposition by October 13, 1998, I

---

**5.** The court granted defendants' motion to dismiss Bray as a defendant in the RICO and ORICO claims on the ground that the complaint failed to allege sufficient participation on Bray's part in the ACLA enterprise. *See Planned Parenthood I,* 945 F.Supp. at 1385.

would hold him in contempt. I now so hold, and further order him in default and his defenses stricken. In the event, however, that the remaining defendants prevail on the issue of whether their statements constitute true threats (see discussion below), then the order of default will be set aside.

## B. THE THREATS

Plaintiffs have identified certain specific documents they contend contain actionable "true threats" when viewed in context. These specific documents are: (1) the "Deadly Dozen" poster and its various republications; (2) the poster of plaintiff Crist; (3) the bumper sticker "Execute Murderers/Abortionists" and its various republications; and (4) the "Nuremberg Files," which also include a file specific to plaintiff Hern that bears the heading "Third Trimester Butchers." These documents are attached to Plaintiffs' Concise Statement as Exhibits 45, 48, 49, 67 (Deadly Dozen); Exhibit 55 (Crist poster); Exhibits 23–31 (bumper sticker); and Exhibits 70–73 (Nuremberg Files [6]).

Plaintiffs also identify as threats certain other ACLA posters distributed at the ACLA's St. Louis event in August 1995. These additional posters, attached as Exhibits 56–60 to Plaintiffs' Concise Statement, are discussed below. None of these additional posters mentions any of the plaintiffs in this case.

Significantly for purposes of the present motions, no statement contained in the text of the Deadly Dozen poster, the Crist poster, or the Nuremberg Files is expressly threatening, in the sense that there are no "quotable quotes" calling for violence against the targeted providers. Instead, the documents contain the following statements:

### 1. Deadly Dozen Poster.

Defendant Crane presented the Deadly Dozen poster at a press conference held during an ACLA meeting on January 21, 1995. Several of the individual defendants, including defendant Bray, were present.

The poster contains a heading in large, bold print that states: "GUILTY of Crimes Against Humanity." The document then

makes a statement about prosecution of abortion as a "war crime" during the Nuremberg trials in 1945–46. The poster next sets out—under the heading "THE DEADLY DOZEN"—the names, addresses, and telephone numbers of 12 people, including both Newhall plaintiffs and plaintiff Hern. The poster then offers a "$5,000 reward" for "information leading to arrest, conviction and revocation of license to practice medicine," states in large letters "ABORTIONIST," and gives the name and address of the ACLA. Thus, the statement that stands out because it is emphasized either by the size and/or boldness of print, reads: "GUILTY OF CRIMES AGAINST HUMANITY *** THE DEADLY DOZEN *** $5,000 REWARD *** ABORTIONIST." *See* Exhibit 45 to Plaintiffs' Concise Statement.

The evidence shows that the FBI informed the Newhall plaintiffs and plaintiff Hern about the poster on the evening of January 21, 1995, and almost immediately offered them around-the-clock federal marshal protection. The FBI also advised these plaintiffs to obtain and wear bulletproof vests and to take other precautions, which they did. Plaintiff Sweigert, who sometimes works at the same Portland clinic where the Newhalls work, also purchased a bulletproof vest within days after the ACLA released the Deadly Dozen poster. In addition, because of their working relationships with the Newhalls and Sweigert, Portland Feminist and Planned Parenthood undertook additional security measures following release of the Deadly Dozen poster.

### 2. The Crist Poster.

The ACLA released the Crist poster and five other posters during a conference held on August 2–5, 1995. Three of the posters specifically identified doctors; three others identified specific reproductive health care clinics. Of these, one (Reproductive Health Services) is a Planned Parenthood affiliate where Crist worked. The evidence shows that several of the defendants were involved in planning the posters.

The poster targeting plaintiff Crist bears the initial heading "GUILTY" in very large

---

[6.] Additional versions of the Nuremberg Files are attached as Exhibit C to the Affidavit of Maria Vullo and as Exhibit G to the Affidavit of Elizabeth Newhall.

print, followed by "OF CRIMES AGAINST HUMANITY" in somewhat smaller print. The poster then sets out the same statement about the Nuremberg trials that appears on the Deadly Dozen poster, followed by the statement "Abortionist Robert Crist." Below that statement is a photograph of Crist, and a listing of his home and work addresses. Directly below the photograph is language, in tiny print, describing Crist as a "notorious Kansas City abortionist [who] travels to St. Louis weekly to kill babies at Reproductive Health Services ***. He also sometimes kills women." The poster next recites information about women allegedly injured by Crist, followed by a request (again, in tiny print) to

> Please write, leaflet or picket his neighborhood to expose his blood guilt. Ask Crist to turn from killing and injuring women and children, to helping and healing those in need.

In large print directly below the quoted language are the words "$500 REWARD" followed by (in tiny print) "to any ACLA organization that successfully persuades Crist to turn from his child killing through activities within ACLA guidelines." Finally, like the Deadly Dozen poster, the word "ABORTIONIST" appears in very large print, followed by the ACLA's name and address. Thus, the emphasized portions of the poster read "GUILTY OF CRIMES AGAINST HUMANITY *** Abortionist Robert Crist *** $500 REWARD *** ABORTIONIST." See Exhibit 55 to Plaintiffs' Concise Statement.

Following release of the poster, Crist received additional protection from both state and federal law enforcement authorities.[7]

### 3. The Bumper Sticker.

According to plaintiffs' evidence, Bray created the bumper sticker, which has been distributed at anti-abortion events and through the mail since about 1992. The bumper sticker, which appears in a variety of exhibits, states, in very large black letters, "EXECUTE." To the right of "execute," in red letters, is the word "Murderers" and the word "Abortionists" directly below it. The advertisements for the bumper sticker state that the background color is yellow. See, e.g., Exhibits 23 and 24 to Plaintiffs' Concise Statement.

### 4. The Nuremberg Files.

During an ACLA event in January 1996, Paul deParrie, who is not a defendant, displayed a box that defendant Crane labeled the "Nuremberg Files." In the box were files that contained personal identifying information on doctors.[8] At the same event, defendants held a "White Rose Banquet," at which they honored individuals who were incarcerated for committing anti-abortion violence.

The Nuremberg Files appeared on the Internet in January 1997. At the top of the first page on the Internet was the statement "VISUALIZE Abortionists on Trial," followed by:

#### THE NUREMBERG FILES

The American Coalition of Life Activists (ACLA) is cooperating in collecting dossiers on abortionists in anticipation that one day we may be able to hold them on trial for crimes against humanity. *Click the Hot Link at the bottom of this page to vote to make this site a "Starting Point Hot Site."* Your vote can bring tens of thousands of people face to face with the fact that everybody faces a payday someday, a day when what is sown is reaped.

#### Why This Must Be Done

One of the great tragedies of the Nuremberg trials after WWII was that complete information and documented evidence had not been collected so many war criminals went free or were only found guilty of minor crimes.

---

7. In August 1992, Crist was accosted by a group led by Treshman at the airport in Houston, Texas. From then until May 1993, Crist did not practice any form of medicine. Eight days after he returned to his medical practice, shots were fired into his children's playroom. No arrests were ever made in the shooting. Affidavit of Robert Crist, ¶ 11.

8. There is evidence that one of the "Nuremberg Files" targeted plaintiff James Newhall. Affidavit of Elizabeth Newhall, Exhibit G. Defendants have not produced that file to plaintiffs. See Plaintiffs' Memorandum in Opposition, p. 32.

We do not want the same thing to happen when the day comes to charge abortionists with their crimes. We anticipate the day when these people will be charged in PERFECTLY LEGAL COURTS once the tide of the nation's opinion turns against child-killing (as it surely will).

Plaintiffs' Concise Statement, Exhibit 70, p. 1. The names of approximately 200 people labeled "ABORTIONISTS: the shooters," as well as more than 200 others[9] are listed in the Nuremberg Files.

As described above, the Nuremberg Files contain personal identifying information (including a photograph) of plaintiff Hern under the heading "THIRD TRIMESTER BUTCHERS." Plaintiffs' Concise Statement, Exhibit 71, p. 1. The document states that the reader "might want to share your point of view with this 'doctor,'" and further states:

> If you can find any other information (web pages, etc.) we'd appreciate you sending it to us.
> Also, Please find out this information on the butchers in your state who do partial birth and third trimester abortions. There certainly must be a special place in hell for such unrepentant slaughterers of God's children.

*Id.* In three areas, the page bears drawings of what appear to be lines of dripping blood.

Also as mentioned above, there is evidence that in 1995, defendants Burnett and Ramey had displayed a Nuremberg File containing a poster and color photographs of plaintiff James Newhall and of his home. There is no evidence that personal information concerning the other plaintiff doctors appeared in the files or on the Internet, although several plaintiffs' names and the names of certain employees of the plaintiff clinics are listed. *See* Plaintiffs' Concise Statement, Exhibit 70, pp. 4–8; *see also* footnote 9.

## C. *THE CONTEXT OF VIOLENCE*

Plaintiffs' submissions describe, in great detail, a period of escalating violence against abortion providers reaching back at least to the murder of Dr. David Gunn in March 1993. Defendants do not seriously challenge the factual accuracy of plaintiffs' description of these events, but focus instead on the relevancy of the contextual events to the legal issues at hand. Accordingly, I will not summarize the facts giving rise to the "context of violence" here, but note only that there is substantial evidence of record from which a rational trier of fact could conclude that the defendants in this case were aware of and promoted the atmosphere of violence surrounding the anti-abortion movement.

## DISCUSSION

### A. *EXISTENCE OF "TRUE THREAT"*

The primary issue raised by defendants' motions is whether the statements plaintiffs attribute to them are protected speech subject to First Amendment protection. If the statements are protected speech then, as a matter of law, each of plaintiffs' claims fails because each depends upon proof that the defendants made threats that are not entitled to constitutional protection.

To sustain their claims under FACE, plaintiffs must prove that the defendants violated or conspired to violate FACE, which, as relevant to this case, proscribes "threats of force" that intentionally "intimidate" a person from providing reproductive health services. 18 U.S.C. § 248(a)(1). "Intimidate" is defined in FACE to mean "to place a person in reasonable apprehension of bodily harm to him—or herself or to another." 18 U.S.C. § 248(e)(3).

With respect to their RICO and ORICO claims, plaintiffs assert, as the requisite predicate acts, that defendants[10] engaged in extortion in violation of the Hobbs Act, 18 U.S.C. § 1951, and the Oregon coercion statute, O.R.S. 163.275, both of which (for purposes of plaintiffs' claims in this case) require proof of threats of force.

 Thus, the viability of each of plaintiffs' claims depends on whether the defen-

---

**9.** The other names appear under the label "CLINIC WORKERS: their weapons bearers," "JUDGES: their shysters," "POLITICIANS: their mouthpieces," "LAW ENFORCEMENT: their bloodhounds," or "MISCELLANEOUS

BLOOD FLUNKIES." Plaintiffs' Concise Statement, Exhibit 70, pp. 5–8.

**10.** That is, all of the defendants except the ACLA, which plaintiffs allege to be the "enterprise."

dants' statements constitute protected speech or unprotected "true threats." This is because unlike political hyperbole or other protected speech, "true threats" are not protected under the First Amendment. *Watts v. United States*, 394 U.S. 705, 708, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969). Although the Ninth Circuit has articulated an objective, speaker-based test for use in determining whether an alleged threat is a "true threat" for purposes of First Amendment analysis, *see, e.g., Lovell v. Poway Unified School District*, 90 F.3d 367, 372 (9th Cir.1996), the applicability of that objective test in the circumstances of this case has been challenged by the defendants and questioned by *amicus curiae*. I discuss the arguments in turn.

### 1. Defendants' Arguments.

Defendants[11] premise their arguments on the proposition that the statements at issue in this case contain no apparent threats and are facially non-threatening. Based on that premise, defendants assert that the court should not resort to "contextual analysis" to determine if a threat exists, *i.e.*, should not consider the factual circumstances, including the surrounding events and the reaction of the listeners, but should instead dismiss plaintiffs' claims on a facial challenge. In support of this argument, defendants rely on a Second Circuit decision, *United States v. Kelner*, 534 F.2d 1020, 1027 (2d Cir.1976). In *Kelner*, the court stated that

> So long as the threat *on its face and in the circumstances* in which it is made is so *unequivocal, unconditional, immediate, and specific* as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution, the statute may properly be applied. (Emphasis added.)

Defendants interpret *Kelner* to require that a threat be "unequivocal, unconditional, immediate, and specific" both on its face *and* in context before it can constitute a true threat. Moreover, defendants contend that the *Kelner* test was adopted by the Ninth

Circuit in *Lovell By and Through Lovell v. Poway Unified School District*, based upon the *Lovell* court's citation to *Kelner* as in "*accord*" with Ninth Circuit precedent. *See Lovell*, 90 F.3d at 372.

Defendants also rely heavily on an Oregon Court of Appeals case, *Hanzo v. deParrie*, 152 Or.App. 525, 953 P.2d 1130 (1998), which involved a challenge to a civil stalking order issued under O.R.S. 30.866, for the proposition that "contextual overlay" may not be considered in assessing facially non-threatening speech. *See Hanzo*, 152 Or.App. at 540, 953 P.2d 1130. Defendants also rely on *Hanzo* as support for their position that expression may only constitute a threat if it is "so unambiguous, unequivocal, and specific to the addressee" that it convincingly expresses the intention that the threat will be carried out. Memorandum of Law on Behalf of Defendants Miller and Threshman, p. 6.

### 2. Plaintiffs' Arguments.

Plaintiffs respond that the Ninth Circuit has consistently applied an objective, speaker-based test in determining whether a threat is a "true threat." *See, e.g., Lovell*, in which the Ninth Circuit explained:

> We have set forth an objective test for determining whether a threat is a "true threat" and, thus, falls outside the protection of the First Amendment: "whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault." *United States v. Orozco–Santillan*, 903 F.2d 1262 (9th Cir. 1990). Furthermore, "[a]lleged threats should be considered in light of their entire factual context, including the surrounding events and the reaction of the listeners." *Id.* (citing *United States v. Gilbert*, 884 F.2d 454, 457 (9th Cir.1989), *** and *United States v. Mitchell*, 812 F.2d 1250, 1255 (9th Cir.1987)) ***.[12]

90 F.3d at 372.

Plaintiffs contend that under Ninth Circuit precedent, statements must be evaluated

---

11. Because the defendants have incorporated each other's submissions, their arguments will not be addressed separately.

12. The citation to *Kelner* on which defendants rely immediately follows the citation to *Mitchell* in the quoted statement from *Lovell*.

within their full context to determine whether they are true threats, and there is no requirement that the threat be apparent on its face before context may be considered. *See U.S. v. Orozco–Santillan*, 903 F.2d 1262, 1265 (9th Cir.1990) (" 'The fact that a threat is subtle does not make it less of a threat' ") (quoting *U.S. v. Gilbert*, 884 F.2d 454, 457 (9th Cir.1989)); *see also U.S. v. Fulmer*, 108 F.3d 1486, 1492 (1st Cir.1997) ("The use of ambiguous language does not preclude a statement from being a threat").[13]

Plaintiffs also argue that the Second Circuit has not adhered to the strict approach defendants would have the court read into *Kelner*. In *U.S. v. Malik*, 16 F.3d 45 (2d Cir.1994), the Second Circuit clarified that ambiguous threats, *standing alone*, cannot establish a predicate for criminal liability. The court recognized, however, that if substantial additional contextual evidence is presented—including evidence of the recipients' states of mind and their reactions—"the existence *vel non* of a 'true threat' is a question generally best left to a jury." *Malik*, 16 F.3d at 50–51. The court explained:

> "Written words or phases take their character as threatening or harmless from the context in which they are used, measured by the common experience of the society in which they are published." Thus, rigid adherence to the literal meaning of a communication without regard to its reasonable connotations derived from its ambience would render the statute powerless against the ingenuity of threateners who can instill in the victim's mind as clear an apprehension of impending injury by an implied menace as by a literal threat. Surely, an equivocal letter with equal chances of being interpreted innocuously or harmfully should not, in and of itself, convince a jury *** that it is a threat. *But once sufficient extrinsic evidence, capable of showing beyond a reasonable doubt that an ordinary and reasonable recipient familiar with the context of the letter would interpret it as a threat, has been adduced the trial court should submit the case to the jury.*

*Malik*, 16 F.3d at 50 (citation omitted; emphasis added).

Finally, plaintiffs maintain that whether a statement is a true threat is a question of fact for the trier of fact. I resolved this issue in favor of plaintiffs in *Planned Parenthood I*, and adhere to my earlier ruling on this point. *See Planned Parenthood I*, 945 F.Supp. at 1372 n. 14 ("contrary to Defendants' assertions, the jury determines whether a threat constitutes a 'true threat' "); *see also Melugin v. Hames*, 38 F.3d 1478, 1485 (9th Cir.1994) (whether plaintiff has shown a "true threat" is a question of fact for the jury, not a question of law for the court).

### 3. *Position of the Amicus Curiae.*

The ACLU acknowledges that the Ninth Circuit has adopted an objective, speaker-based test to determine whether an alleged threat is a true threat for purposes of First Amendment analysis. Nevertheless, the ACLU urges the court to adopt a different test in this case, one with both an objective, listener-based component and a subjective, speaker-based component. The subjective speaker-based component is necessary, according to the ACLU, to insure that there is proof that the speaker actually intended to threaten rather than merely to communicate an idea using protected speech. Specifically, the ACLU proposes that plaintiffs be required to show the following:

1. Considering the alleged threat in light of its relevant factual context, would a reasonable listener (or recipient of the communication) interpret the statement as communicating a serious expression of an intent to inflict or cause serious harm to the listener, i.e., would a reasonable person perceive the statement as a threat?

2. Did the speaker intend that the communication be taken as a threat to inflict or cause serious harm to the listener, thereby intending to place the listener in fear for his or her safety, regardless of whether the speaker actually intended to carry out the threat?

---

**13.** The *Fulmer* court affirmed the trial court's jury instruction that "the fact that a threat is subtle or lacks explicitly threatening language does not make it less of a threat." 108 F.3d at 1494.

Memorandum of ACLU Foundation of Oregon, p. 27.

At oral argument, the ACLU justified this substantial departure from Ninth Circuit precedent by arguing that the present case is sufficiently distinguishable as to qualify as one of first impression in this circuit. In saying this, the ACLU appears to agree with defendants the statements at issue are facially innocuous, *i.e.*, contain no express threats or even ambiguously threatening language.

### 4. *Analysis.*

██ In view of the parties' arguments, the threshold issue that must be resolved is whether the Ninth Circuit has adopted by reference the narrow *Kelner* requirement that a threat be "so unequivocal, unconditional, immediate and specific *** as to convey a gravity of purpose and imminent prospect of execution." *Kelner*, 534 F.2d at 1027. Although defendants read much into the *Lovell* court's use of the signal *accord*, as the *amicus curiae* points out, the Ninth Circuit's use of the signal *accord* is confusing at best, *see* Memorandum of ACLU Foundation of Oregon, p. 30 n. 24, and I am not persuaded that by that simple reference, the Ninth Circuit intended thereafter to graft the *Kelner* test—however it is interpreted—onto existing Ninth Circuit law. Instead, I construe the citation to *Kelner* as a recognition that the Second Circuit, like the Ninth Circuit, holds that whether a threat is a true threat must be determined in light of the context (or circumstances) in which it is made.

That the Ninth Circuit does not consider *Kelner* controlling is apparent even from *Lovell*, the case on which defendants rely. In *Lovell*, the Ninth Circuit reversed a trial court judgment in favor of the plaintiff, a high school student who was suspended for threatening her school guidance counselor. The parties gave differing versions of the remark that was the basis of the suit. The student claimed that she said "I'm so angry, I could just shoot someone," whereas the guidance counselor claims the student said "If you don't give me this schedule change, I'm going to shoot you!" *Lovell*, 90 F.3d at 369. The trial court evidently accepted the student's version, at least in part. *See Lovell*, 90 F.3d at 369 n. 1. After making the statement, the student apologized to the guidance counselor for her inappropriate behavior, and left the office.

The trial court found that no matter which statement the student made, it was not a "true threat." In reversing, the Ninth Circuit noted that the trial court "lost sight" of the fact that the *ultimate inquiry is whether a reasonable person in [the student's] position would foresee that [the guidance counselor] would interpret her statement as a serious expression of intent to harm or assault.* 90 F.3d at 372 (emphasis added). The court held that a reasonable person in the circumstances would have foreseen that the guidance counselor would interpret the statement "If you don't give me this schedule change, I'm going to shoot you"—a conditional threat—as a serious expression of intent to harm. *Lovell*, 90 F.3d at 372; *see also U.S. v. Gilbert*, 884 F.2d at 457 (fact that threat is subtle does not make it less of a threat; trial court was correct in reviewing all mailings as a whole, rather than parsing them).

I conclude that, to the extent the Second Circuit continues to adhere to *Kelner* (see the discussion at pages 20–21, *supra*), it is not Ninth Circuit law.

I turn now to the question of whether the Ninth Circuit objective speaker-based test should apply in this case, or whether I should adopt the ACLU's proposed two-part test. I have carefully evaluated the Ninth Circuit cases from which the present objective test evolved, and conclude that the existing test adequately protects the defendants' First Amendment rights in this case.

It appears that the Ninth Circuit first articulated the objective speaker-based test in *Roy v. United States*, 416 F.2d 874 (9th Cir.1969). In *Roy*, the court was called upon to construe the willfulness requirement of 18 U.S.C. § 871, which prohibited "willfully" threatening the President of the United States. The court held that "willful" was coextensive with "intentional":

This Court therefore construes the willfulness requirement of the statute to require only that the defendant intentionally make a statement, written or oral, in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by

those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm upon or to take the life of the President, and that the statement not be the result of a mistake, duress, or coercion. The statute does not require that the defendant actually intend to carry out the threat.

*Roy,* 416 F.2d at 877–78 (footnotes omitted). Thus, in *Roy,* the Ninth Circuit concluded that for purposes of section 871, "willful meant only intentional." *Gilbert II,* 884 F.2d at 458; *see Roy,* 416 F.2d at 877. Moreover, *Roy* established that the appropriate test for insuring proof of the requisite intent was an objective, speaker-based test. The test set forth in *Roy,* however, unlike the current Ninth Circuit formulation in, for example, *Lovell,* also appears to have included an element of proof that the statement was not "the result of mistake, duress, or coercion" or even jest. *Roy,* 416 F.2d at 877–78.

In *United States v. Merrill,* 746 F.2d 458 (9th Cir.1984), the court again emphasized that the intent requirement of section 871 was to be determined by the objective test set forth in *Roy,* 746 F.2d at 462. The *Merrill* court also emphasized that "[w]hether any given form of written or oral expression constitutes a true threat for the statute's purposes is a question for the trier of fact under all of the circumstances." *Merrill,* 746 F.2d at 462.

A few years later, in *U.S. v. Gilbert,* 813 F.2d 1523 (9th Cir.1987) ("Gilbert I"), the court addressed the defendant's First Amendment challenge to a provision of the Fair Housing Act, 42 U.S.C. § 3631, a statute remarkably similar to FACE. Section 3631 prohibits, among other things, use of threats of force to "willfully" intimidate or interfere with any person on the basis of race, color, religion, sex, or national origin in the occupation of a dwelling, including the placement of adopted children in housing. *See U.S. v. Gilbert,* 813 F.2d 1523, 1526–27 (9th Cir.1987) ("*Gilbert I* "); *see also U.S. v. Gilbert,* 884 F.2d 454, 456 (9th Cir.1989) ("*Gilbert II* ").

In rejecting defendant's First Amendment challenge to his indictment under the statute, the court noted that the element of intent— *i.e.,* the "willfulness requirement"—was the "determinative factor separating protected expression from unprotected criminal behav-

ior." *Gilbert I,* 813 F.2d at 1529. The court further noted, however, that

> Whether any given form of written expression can supply the requisite intent requirement is a question for the trier of fact. *** Certain types of expression which by their nature inflict injury or tend to incite an immediate breach of the peace are arguably unprotected. *** The government bears the ultimate burden of proving that Gilbert's actions were taken with the requisite intent to place them into that category. *** Thus it is a jury question whether actions and communications are clearly outside the ambit of first amendment protection.

*Gilbert I,* 813 F.2d at 1529–30 (citations omitted).

Two years later, in *Gilbert II,* the Ninth Circuit decided Gilbert's direct appeal from his conviction under section 3631. Confirming that section 3631 contains an intent requirement, the Ninth Circuit also extended the rationale of *Roy* (decided under 18 U.S.C. § 871) to section 3631, holding, in essence, that whether a threat is a "true threat" must be determined in light of the entire factual context, including consideration of surrounding events and the reaction of the listeners. *Gilbert II,* 884 F.2d at 457, 458. The court stated:

> While the mailings may not have said "we're going to hurt you, Susan Smith," they certainly said "we don't like what you're doing, and we hurt people who do things we don't like." The fact that a threat is subtle does not make it less of a threat. The district court was correct in reviewing all of the mailings as a whole, rather than parsing them as Gilbert suggests. Viewed as a whole, and using the contextual analysis we have used for other statutes, a rational trier of fact could find a threat.

*Gilbert II,* 884 F.2d at 457.

Significantly, the court affirmed the trial court's rejection of defendant's proposed jury instruction that stated that a threat is willfully made " 'if the maker voluntarily and intelligently utters the words in an apparent determination to carry out the threat,' " finding

no material difference between an instruction requiring a true threat and one requiring " 'an apparent determination to carry out the threat.' " 884 F.2d at 457. The court explained:

> [In *Roy*,] [w]e concluded that willful meant only intentional. *** This rationale—that the threat *qua* threat is harmful and prohibited—would best serve the purpose of section 3631. ***
>
> Under the analysis suggested by *Roy*, it is clear that the district court did not abuse its discretion. The given instruction advised jurors that the threat must be a "true threat"—as opposed, for example, to political hyperbole—and that it must have been intentionally made. Whether language is or is not a true threat is a proper question for a jury.

*Gilbert II*, 884 F.2d at 458 (citations omitted).

The Ninth Circuit has consistently adhered to the *Roy* objective test. In *U.S. v. Orozco–Santillan*, 903 F.2d 1262 (9th Cir.1990), for example, the defendant was convicted of threatening federal law enforcement officers in violation of 18 U.S.C. § 115. In analyzing the defendant's assertion that his statements were not threats, the court noted that "alleged threats should be considered in light of their entire factual context, including the surrounding events and reaction of the listeners." 903 F.2d at 1265 (citing *Gilbert II*, 884 F.2d at 457). The court further explained that

> Whether a particular statement may properly be considered to be a threat is governed by an objective standard—whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault. *** A "true" threat, where a reasonable person would foresee that the listener will believe he will be subjected to physical violence upon his person, is unprotected by the first amendment.

*Orozco–Santillan*, 903 F.2d at 1265–66. In a footnote, the court further clarified that "[t]he only intent requirement is that the defendant intentionally or knowingly communicates his threat, not that he intended or was able to carry out his threat." 903 F.2d at 1265 n. 3 (citing *Gilbert II*, 884 F.2d at

456–57; and *United States v. Davis*, 876 F.2d 71, 73 (9th Cir.1989) (applying 18 U.S.C. § 876)).

Importantly, the statute at issue in *Gilbert I* and *II*, 42 U.S.C. § 3631, and FACE, 18 U.S.C. § 248(a), are nearly identical in all respects material to this case. Section 3631(c) punishes

> [w]hoever *** by force or *threat of force willfully* injures, *intimidates*, or interferes with, or attempts to injure, intimidate, or interfere with *** any citizen because he is or has been, or in order to discourage such citizen or any other citizen from lawfully aiding or encouraging other persons to participate, without discrimination on account of race, color, religion, sex or national origin, in [the occupation of a dwelling].

42 U.S.C. § 3631(c) (emphasis added).

Similarly, FACE punishes

> [w]hoever *** by force or *threat of force* or by physical obstruction, *intentionally* injures, *intimidates* or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any person or any class of persons from, obtaining or providing reproductive health services ***.

18 U.S.C. § 248(a)(1) (emphasis added).

Although section 3631 uses "willfully" and FACE uses "intentionally," under the Ninth Circuit precedent discussed above, the difference in language between the two statutes is not substantive. Thus, while the ACLU is correct that FACE contains an element of intent, that requirement is not peculiar to FACE and does not, in my view, require a departure from existing Ninth Circuit law. Both statutes punish threats and both, therefore, carry the potential to encroach on First Amendment rights. The rationale of *Roy*, which the Ninth Circuit has extended repeatedly to other "threat" statutes, applies equally here.

If there is a distinction between existing Ninth Circuit cases and this one, it is in the content of the statements constituting the alleged threats. On this, I tend to agree with the defendants and the ACLU that the statements at issue do not contain any ex-

pressly or apparently threatening language. Nevertheless, I do not agree with defendants that a threat must be apparent on its face before context may be considered. Instead, the Ninth Circuit consistently has emphasized that whether statements are "true threats" must be determined "in light of their entire factual context." *See, e.g., Lovell, supra,* 90 F.3d. at 372. I also do not agree that the lack of expressly threatening language requires creation of a different test. In *Roy,* for example, the defendant argued that the word "get" in the statement "I am going to get him" could innocently mean only "become even with" or "gain an advantage over." The Ninth Circuit emphasized that the import of the statement as innocent or threatening must be determined from the context in which it was made. *Roy,* 416 F.2d at 876 n. 6.[14]

The ACLU's concern, as well as that of the defendants, is that liability not attach unless the threats are intentionally made, and do not constitute jests or political hyperbole, even extreme political hyperbole. The cases discussed above amply show that the Ninth Circuit shares this concern, and yet repeatedly has confirmed that an objective speaker-based test that considers all the circumstances is sufficient to permit the trier of fact to distinguish between "true threats" and speech protected by the First Amendment. *See, e.g., Gilbert II,* 884 F.2d at 457 n. 5, and *Gilbert I,* 813 F.2d at 1529 ("the statute's requirement of intent to intimidate serves to insulate the statute from unconstitutional application to protected speech"). Accordingly, I decline to depart from established Ninth Circuit law and create a test unique to this case.[15]

**B. *THE ALLEGED THREATS***

 Of the documents plaintiffs contend contain threats, I agree with the ACLU and the defendants that only three of them, the Deadly Dozen poster, the Crist poster, and the Nuremberg Files (including the Hern

poster contained in the Nuremberg Files), are actionable. Plaintiffs' evidence fails to raise an issue of fact as to whether the defendants reasonably should have foreseen that the plaintiffs would interpret the bumper sticker "as a serious expression of an intention to inflict bodily harm" on any one of them. *Roy,* 416 F.2d at 877. While the bumper sticker suggests violent action and may represent the fringe of political hyperbole, the generality of language and the circumstances of its wide dissemination convince me that it is not susceptible of an interpretation that it constitutes a "true threat" of harm to anyone in particular. The defendants' involvement in the creation, sale, display, or approval of the bumper sticker, however, certainly are part of contextual facts relevant to this case.

The other posters identified by the plaintiffs as alleged threats (Exhibits 56–60), which the ACLA released in St. Louis in August 1995, do not refer to any of these plaintiffs. Plaintiffs have not argued that they should be allowed to proceed on the specified posters, and I conclude that those posters are not actionable in this case.

In summary, plaintiffs' claims of threat, as opposed to the context in which the threats were made, are limited to the Deadly Dozen poster, the Crist poster, the Nuremberg Files (including the Hern poster), and any republications of those documents.

**C. *STANDING OF PLAINTIFFS SWEIGERT, PLANNED PARENTHOOD, AND PORTLAND FEMINIST***

 Defendants contend that plaintiffs Sweigert, Planned Parenthood, and Portland Feminist lack "standing" to pursue claims under either FACE or RICO, because the alleged threats did not specifically mention or target them. According to defendants, Sweigert, Planned Parenthood, and Portland Feminist "are nothing more than bystanders, pointing to the alleged misfortunes of third

---

**14.** Moreover, despite some similarities between the facts of this case and the conduct at issue in *Hanzo v. deParrie,* 152 Or.App. 525, 953 P.2d 1130 (1998), state law analysis, while certainly instructive, does not "trump" Ninth Circuit analysis of federal law. *See Lovell,* 90 F.3d at 371 (district court implicitly and inappropriately allowed California Education Code to trump federal law). Thus, *Hanzo,* decided under state law, is not controlling.

**15.** I emphasize that plaintiffs will not be permitted to present "expert" evidence on the issue of whether the statements are "true threats."

parties as their only basis for standing." Reply Memorandum of Defendants Miller and Treshman, p. 70.

FACE permits "[a]ny person aggrieved by reason of the conduct prohibited by subsection (a)" to commence a civil action for recovery of injunctive relief, compensatory damages, and punitive damages. 18 U.S.C. § 248(c)(1)(A) and (B). Sweigert and the clinic plaintiffs have presented evidence that, because of their working relationships with the actual targets of the alleged threats, they also felt threatened and undertook security measures as a result. While defendants express skepticism toward plaintiffs' evidence, I am not persuaded that these plaintiffs lack standing *as a matter of law* to pursue their claims. As acknowledged by the plaintiffs in their reply brief, at trial *each* plaintiff will be required to prove that a reasonable person [16] in that plaintiff's position would have felt threatened by the defendants' statements in the context in which the statements were made. Moreover, to prevail on their RICO and ORICO claims, each plaintiff must prove pecuniary loss. Nevertheless, Sweigert's and the clinics' evidence, although thin, is sufficient to create a genuine issue of material fact on these issues for purposes of the present motions, and summary judgment must be denied.

## D. *AVAILABILITY OF PUNITIVE DAMAGES*

As in their earlier motions, defendants again contend that Article I, section 8, of the Oregon Constitution prohibits any award of punitive damages in this case. Defendants assert: "The Oregon Constitution forbids punitive damages for any injury resulting even from an *abuse* of *protected expression.*" Memorandum of Law on Behalf of Defendants Miller and Treshman, p. 48 (underscoring added). That argument itself, however, suggests the proper resolution of the issue at this juncture. If the trier of fact determines that defendants have made "true threats," then defendants' statements are not "protected expression" under either the Oregon Constitution or the First Amendment. *See* the discussion of this issue in *Planned Parent-*

*hood I,* 945 F.Supp. at 1387–88. If the trial results in a decision against some or all of the defendants on the issue of "true threat," then and only then will I determine whether to submit the issue of punitive damages.

## E. *REMAINING ISSUES*

Defendants make a variety of other arguments in favor of summary judgment or partial summary judgment. These other arguments either depend on a finding that the statements at issue are not "true threats" as a matter of law, or involve issues of disputed fact (including the involvement of each defendant in making or conspiring to make the alleged threats). Accordingly, to the extent that this opinion has not already addressed these arguments, defendants' remaining arguments are rejected with respect to the present motions.

## CONCLUSION

Defendants' motions for summary judgment (è203, 206, and 211) are DENIED with the following exceptions: Summary judgment is granted in favor of all defendants on plaintiffs' claims arising out of the bumper sticker and the posters attached as Plaintiffs' Exhibits 56–60 to the Concise Statement of Material Fact. It is further

ORDERED that (1) defendant Bray is reinstated as a defendant to plaintiffs' RICO and ORICO claims, and (2) defendant Bray is in contempt and declared to be IN DEFAULT and his defenses stricken as a sanction for noncompliance with court orders, subject to relief from default, if appropriate, after a verdict is rendered on the issue of the existence of "true threats."

---

**16.** To prove intimidation, each plaintiff must prove that he or she was placed "in *reasonable* apprehension of bodily harm to him or herself or

to another." 18 U.S.C. § 248(e)(3) (emphasis added).